# UNEMPLOYMENT COMPENSATION COMMIS-
## SION OF WYOMING v. MATHEWS

(No. 2183; March 11, 1941; 111 Pac. (2d) 111)

480

For the plaintiff and appellant, the cause was submitted on the brief of *Ewing T. Kerr*, Attorney General of Cheyenne, Wyoming, and *James G. McClintock* of Casper.

For the respondent, the cause was submitted on the brief of *G. A. Layman* of Sheridan.

RINER, Chief Justice.

The Unemployment Compensation Commission of Wyoming was defeated in its attempt to collect from

J. P. Mathews, doing business under the firm name and style of The Palace Cafe and Bar Service, certain contributions alleged by said Commission to be due on account of the services of certain bands or orchestras which rendered services as musicians under the circumstances hereinafter detailed. The parties will be herein designated occasionally and for the sake of brevity: the Unemployment Compensation Commission of Wyoming as the "Commission" and J. P. Mathews as the "owner".

The action which the Commission instituted for the purpose above indicated was brought in the district court of Sheridan County by the Commission against the owner under the provisions of Chapter 113 of the 1937 Session Laws of Wyoming as amended by Chapter 124 of the Session Laws of Wyoming, 1939, and was tried to the court without a jury, with the result above mentioned. The record in the cause was brought here by direct appeal, the Commission claiming prejudicial error in the trial court's general finding and judgment thereon in said action against it. The record discloses that there was submitted in the course of the trial of the action evidence of certain facts and circumstances as follows:

The owner is engaged with one John Wallace, who is a silent partner and general manager in a business located in the City of Sheridan at No. 141 North Main Street, and known as The Palace Cafe and Bar and a room called the "Palace Gardens" in connection with said cafe and bar. The Palace Gardens is an additional room connected with and entered through the cafe and operated as a lounge, where people may go for meals or drinks as guests may desire. "It is a dining room and a banquet room to the cafe". It is used in the day time or at night if the owner gives a dance or entertainment for the people.

Contributions to the Commission were paid by the owner on the wages of the waitresses, cooks and bartenders employed in the business. The owner provided orchestras or bands for the benefit of the patrons of the Palace Gardens that came in to dance or that came in and ordered refreshments, and these organizations furnished their services in that room during the hours from approximately 8:30 P. M. to 1:00 or 1:30 A. M. "on week nights"; on Saturday nights they worked from 7:30 to 12:30 P. M. No admission was charged to customers of the gardens and these bands or orchestras were hired through their leaders or contractors for the most part by Wallace, though the owner hired some of them.

The evidence submitted in the case deals chiefly with the relations existing between the owner and two bands or orchestras directed, one by a man by the name of Brooklander and one by a man named Sidell. The boss or director of each orchestra or band directed its work. They were paid weekly by checks payable either to the order of the directors or leaders of the orchestras or to "Brooklander's Orchestra" or to "Sidell's Orchestra". These checks were always endorsed by the several directors or leaders of these organizations, but not by the individual members thereof when they were cashed. Some of the checks were cashed in the bank and others in grocery stores where they had been trading. Wallace hired Brooklander and either Mathews or Wallace hired Sidell to furnish music for the patrons that came to the Palace Gardens room for "refreshments, eats". Neither the owner nor Wallace had the right to discharge members of these bands or orchestras, that right being vested in the director of these several organizations. Occasionally Wallace told Brooklander when to take intermissions in playing, though originally Brooklander and Wallace had a general agreement, entered into before his organization com-

menced its work, to take intermissions just before the bar closed. Sidell testified that he was told that in taking other intermissions he was to use his own judgment. The checks aforesaid were cashed by the leaders of these organizations, and the other members were paid by such leaders after deducting any board bills or "tabs" owed by them to the cafe of the owner.

The musicians in these several organizations supplied their own musical instruments, though the owner furnished a piano which was used by them in the course of their work. The Musicians' Union of the City of Sheridan governed the minimum rate to be paid these bands or orchestras for their services. In the case of the two organizations just mentioned payment was required to be made in the sum of $27.50 for the leader and $25.00 each per week for "side men", and the leaders contacted "men to play" engagements for the owner. In other words, the owner or Wallace merely hired the leader and he hired his musicians, the minimum wage scale for the band being fixed by the Musicians' Union of the City of Sheridan. The leaders of these bands or orchestras were privileged to obtain more money for their weekly services if they could obtain it. Under the aforesaid Union's rules there must be "a leader or contractor". These organizations could have had other engagements so far as they did not conflict with their engagement at the Palace Gardens.

The owner did not furnish the music these several organizations used in rendering their services. On a couple of occasions Mathews or Wallace told Brooklander what pieces were to be played. Brooklander told his organization when to start and when to stop playing and also when to play encores. These leaders had the final authority to determine what music should be played and were the sole judges as to whether any musician in his organization was doing his work properly. The members of these orchestras or bands "looked

to" their leaders for payment of their salaries, if such leaders received money from the owner for the orchestra's weekly wages and did not pay it over to them. These orchestras or bands played in other cities in the state, the Brooklander organization playing in Casper, Wyoming, under the name "Jimmie Brooklander and his Band" sometime before they came to Sheridan. The Sidell organization was designated "J. Sidell and Boys", and Sidell testified that he was "responsible to the members of that band for their salary".

Brooklander never paid any Social Security tax for the musicians employed by him, though he offered to pay them to the government. Before Brooklander was employed by Wallace the other employers Brooklander worked for deducted the tax from the latter's pay check, but Wallace did not do so, as he said he did not have anything to do with it. Wallace testified for the defendant that "at times if I didn't think they (the musicians) were playing often enough I would go around and ask them to play more often", and they usually did so.

Under Section 2 of Chapter 113, Laws of Wyoming, 1937, which embodies the Unemployment Compensation law of this State and which undertakes to supply certain definitions, we find that sub-division "(i) (1)" reals:

" 'Employment', subject to the other provisions of this sub-section, means service, including service in interstate commerce, performed for wages or under any contract or hire, written or oral, express or implied."

Sub-division "(n's)" language under said Section so far as pertinent here is:

" 'Wages' means all remuneration payable for personal services, including commissions and bonuses and the cash value of all remuneration payable in any medium other than cash.";

while sub-division "(i) (5)" under said Section embodies these provisions:

"Services performed by an individual for wages shall be deemed to be employment subject to this Act unless and until it is shown to the satisfaction of the Commission that—

(A) such individual has been and will continue to be free from control or direction over the performance of such service, both under his contract of service and in fact; and

(B) such service is either outside the usual course of the business for which such service is performed or that such service is performed outside of all the places of business of the enterprise for which such service is performed; and

(C) such individual is customarily engaged in an independently established trade, occupation, profession or business."

As we are advised, all the States of the Union as well as all the Territories thereof, including the District of Columbia, have adopted unemployment compensation laws of the same general character as that enacted in Wyoming. Then there is the Social Security Act with its titles VIII and IX, passed by the national Congress and which would appear to have supplied the model from which the subsequent state and territorial legislation of this character was patterned with sundry variations. These variations have produced conflicting rulings on the part of appellate courts in many of the states concerning statutory phraseology substantially similar and upon sets of facts which seemingly closely resembled each other. And one state appellate court has apparently adopted a somewhat different interpretation of legislation of this character from that at first announced. However, the facts of the two cases were not the same. See McDermott v. State, 196 Wash. 261, 82 P. 2d 568, decided in 1938; and Washington Recorder Publishing Company v. Ernst, 199 Wash. 176,

91 P. 2d 718, decided in 1939. In the McDermott case, supra, it was held that barbers employed by the proprietor of a barber shop, under certain oral lease agreements with each barber, were "employees" within the meaning of the Washington Act and that these agreements were "contracts of service" within the meaning of the Unemployment Compensation Act, the operatives not being free from the control of the proprietor over the performance of their services and services not being rendered outside of the usual course of his business or outside his shop and that the operatives aforesaid were not engaged in an independently established trade, occupation or business of the same nature as that involved in the contract of service. In the course of its opinion the court stated:

"It is unnecessary to determine whether the common law relation of master and servant exists between respondent and the barbers and other operatives in his shop, because the parties are brought within the purview of the unemployment compensation act by a definition more inclusive than that of master and servant." Certain definitive provisions of the Act were then quoted and they appear to be substantially the same as those in the Wyoming Act above set forth. In the later Publishing Company case, supra, the Washington court substituted a quite different test to be used in determining the existence of the employer and employee relationship and held that newspaper carriers were "independent contractors" and not employees under the Unemployment Compensation Act and under the circumstances shown by the record.

The contract between the company and the carriers required the latter to purchase the papers from the company at an agreed rate per week per paper and to pay therefor weekly; the carriers sold their papers to customers on designated routes at the price governed by the contract, and if said carriers failed to make collections the loss fell upon them. No control was exer-

cised by the company over the time and manner of distribution of the papers, except as provided in the contract, and no control was exercised over the time and methods of collection. The contract particularly declared that it was clearly understood that the carriers were not employees of the company. Construing the language set forth in the Washington Unemployment Compensation Act and which is quite like the quoted provisions of the Wyoming law above set forth verbatim, the Washington court stated that:

"In the Restatement of the Law of Agency nine different items are recited as the principal elements to be considered in determining which relationship exists. In the enactment of the Unemployment Compensation Statute the legislature selected or picked out three elements to be considered. The legislature did not say, nor is the language capable of that interpretation, that each of those elements must exist one hundred per cent in order to establish the relationship of independent contractor. * * * *

"The courts have never held that, in the determination of the relationship of independent contractor, there must be an absolute and complete freedom from control. The common law test and the statutory test are the same. * * * *

"In drafting the statute the legislators attempted to codify the common law. They intended that the common law test of employment relationship should likewise be the test under the Unemployment Compensation Act."

Other illustrative cases interpreting Acts of this character are: Texas Co. v. Wheeless, 185 Miss. 799, 187 So. 880; Industrial Commission v. Northwestern Mutual Life Insurance Co., 103 Colo. 550, 88 P. 2d 560; Unemployment Compensation Commission of North Carolina v. Jefferson Standard Life Insurance Co., 215 N. C. 479, 2 S. E. 2d 584; Wisconsin Bridge & Iron Co. v. Industrial Commission et al., 233 Wis. 467, 290 N. W. 199; Globe Grain & Milling Co. v. In-

dustrial Commission, 98 Utah 36, 91 P. 2d 512; Creameries of America, Inc. v. Industrial Commission, 98 Utah 571, 102 P. 2d 300; Salt Lake Tribune Publishing Co. v. Industrial Commission, (Utah) 102 P. 2d 307; and Schomp v. Fuller Brush Co., 124 N. J. L. 487, 12 A. 2d 702; but in connection with the last case cited see, however, Fuller Brush Company v. Industrial Commission of Utah, (Utah) 104 P. 2d 201.

In the Texas Co. v. Wheeless case, supra, the Mississippi Supreme Court in discussing provisions appearing in the Unemployment Compensation Act in that State similar to subdivision "(i) (1)" and "(n)", supra, under Section 2 of Chapter 113 aforesaid, used this language:

"Moreover, the Act here in question imposes the contributions on an employer as an excise tax. The Federal Social Security Act § 901, 42 U. S. C. A. § 1101, so defines it, and the United States Supreme Court so construes it in the cases of Steward Machine Company v. Davis, 301 U. S. 548, 57 S. Ct. 883, 81 L. Ed. 1279, 109 A. L. R. 1293, and Helvering v. Davis, 301 U. S. 619, 672, 57 S. Ct. 904, 81 L. Ed. 1307, 109 A. L. R. 1319. And, being an excise tax, every doubt as to its application here must be resolved in favor of appellant and against the taxing power. (Citing Cases) It is also necessary that we should keep in mind that in construing a statute it must be assumed that the Legislature employed the words of the statute in their usual and ordinary sense, unless it clearly appears that they were intended to be used otherwise and to convey a different meaning. (Citing Cases)"

In Wisconsin Bridge & Iron Co. v. Industrial Commission et al., supra, the opinion states the law involved thus:

"Sec. 108.02 (5) provides that: 'Employment' * * * means any service performed by an individual for pay * * * under any contract of service for pay or contract of hire * * * whether such individual's contract was directly made with and paid by the employer or through

a person in his employ * * *; and each individual thus engaged * * * to perform services for pay shall * * * be treated as in an 'employment', unless and until the employer has satisfied the commission * * *' of three things. These things as applied to the instant case are:

"(1) That such individual (claimant) was free from the Company's control or direction over the performance of his (such individual's) contract of service; and (2) that such (individual's) work was performed outside of all the employer's (Company's) places of business; and that (3) such individual was customarily engaged in an independently established trade, business or occupation."

We find also in the court's opinion this language:

"It must of course be determined whether Drews was an independent subcontractor or an employee, because it is only through his status as an employee being determined that the claimants can be held to have been employees of the Company. To render the claimants employees of the Company Drews must have been an employee of the Company in the sense that he was hiring the claimants for and in behalf of the Company as its agent. But that status is not to be determined from the language of the Unemployment Compensation Act. It must be determined as such status is determined at common law or under the Workmen's Compensation Act. St. 1937, § 102-01 et seq. The status is determined by the same consideration under the Workmen's Compensation Act as under the common law. Statutes are not to be construed as changing the common law unless the purpose to effect such change is clearly expressed therein. To have such effect 'the language (of the statute) must be clear, unambiguous, and peremptory'. Meek v. Pierce, 19 Wis. 300, 303. That rule has been consistently adhered to ever since it was so stated in the case cited. See 5 Callaghan's Wis. Digest, p. 1887; id. 1934 Suppl., p. 844; Brown v. Loewenbach, 217 Wis. 379, 258 N. W. 379. There is no language in sec. 108.02, Stats., or elsewhere in the Act in which the section is incorporated to indicate a purpose or intent to make the status, as subcontractor or employee, of a person who (Drews) hires employees to do work in performance of a contract of

an independent contractor (Company) dependent on the definition of an employee under sec. 108.02 or dependent on any other considerations than those that determined such status of such person at common law."

The constitutionality of the Federal Social Security Act and the State laws complementary thereto has been upheld in several decisions, notably: Carmichael v. Southern Coal & Coke Co., 301 U. S. 495, 57 S. Ct. 868, 81 L. Ed. 1245, 109 A. L. R. 1327, where the Alabama Act was sustained; Helvering v. Davis, 301 U. S. 619, 57 S. Ct. 904, 81 L. Ed. 1307, 109 A. L. R. 1319, upheld the Federal Social Security Act, as did Steward Machine Co. v. Davis, 301 U. S. 548, 57 S. Ct. 883, 81 L. Ed. 1279, 109 A. L. R. 1293. The Massachusetts Act was sustained in Howes Bros. Company v. Massachusetts Unemployment Compensation Commission, 296 Mass. 275, 5 N. E. 2d 720, certiorari denied 300 U. S. 658, 57 S. Ct. 434, 81 L. Ed. 867.

A rather comprehensive search of the authorities has revealed that but one case with facts resembling those at bar—i.e. involving orchestras or bands—has been decided by an appellate court under statutory enactments like the excerpted language of our Chapter 113, supra. Our attention was not called to this one case by counsel for the very good reason that it was decided and reported after briefs were filed and argument had herein. However, we have had drawn to our attention the Federal Internal Revenue Bulletin No. 38, issued September 18, 1939, and a ruling therein reported at Page 7, which refers to and discusses an earlier mimeographed ruling of the Department and certain forms of contracts with bands and orchestras and the effect of so-called "name" and "no-name" organizations of this kind. But we do not find the decision therein set forth particularly helpful under the facts and law involved here. We note the concluding paragraph of the discussion aforesaid reads as follows:

"It should be especially noted that the above conclusions were arrived at upon consideration of the facts involved in the particular engagements. It should not be inferred therefrom that Mimeograph 4651, supra, is revoked, since, as stated above, the conclusions reached in the mimeograph are applicable only to situations similar to those outlined therein. The manner in which the orchestra conducted by B is organized and the circumstances under which it performs services are such, however, that the mimeograph does not furnish an exclusive test for determining the status, under Subchapters A and C, Chapter 9, of the Internal Revenue Code (formerly Titles VIII and IX of the Social Security Act), of B and the members of his orchestra."

Our examination of the authorities has brought to our notice the following recently decided cases: Under the New York Labor Law, Section 500 et seq. it was held in the case of In re Rogavin's Claim, 18 N. Y. S. 2d 302, by the appellate division of the Supreme Court that where a leader of a thirteen piece orchestra "individually and as agent" for the orchestra entered into a contract with a company operating a restaurant for the services of such an orchestra, and under the contract the company had the right to control in many respects the manner in which members of the orchestra were to perform their services, each member of the orchestra was deemed to have been employed by the company as their "employer", so as to make the company liable for payments required by the state unemployment insurance law.

The New York law would appear to be considerably broader and more inclusive in its phraseology than the Wyoming law.

In Ajello v. Savarins Management, Inc., 19 N. Y. S. 2d 886, by the Supreme Court, Appellate Division, it was similarly decided that where the employer employed an orchestra leader to assemble an orchestra which was not a permanent organization, for a special

engagement, and agreed that the rules of the Musicians' Union would be controlling, and such rules provided that musicians employed through such contractors would be deemed employees of the principal and the contractor should be deemed the agent of the principal and of the employed musicians in effecting such employment, a musician who was a member of the orchestra was an "employee" of the employer aforesaid and entitled to unemployment insurance benefits.

However, in the case of In re Brown, 23 N. Y. S. 2d 330, it was held by the same court, with practically identical membership, that where a hotel through a booking agency contracted for the services of an orchestra, the members of which were employees of the orchestra leader, a vocalist who was a member of the orchestra was not entitled to benefits under the Unemployment Insurance law as an "employee" of the hotel, since she was an employee of the orchestra leader, who was an "independent contractor", and the court declared that the case was "readily distinguishable" from the two cases last above mentioned. All of these cases were decided in 1940, the last one being determined on November 13th of that year.

In Fuller Brush Company v. Industrial Commission of Utah, supra, in discussing provisions of a law identical in phraseology with the quoted provisions of subdivision " (i) (5) ", supra, the court said:

"A few illustrations will make clear the purpose and meaning of the three factors. A takes to the blacksmith a horse to be shod and a plow point to be sharpened. The smith renders personal service and receives remuneration for his time and labor, which constitutes wages under the act. But it was not contemplated that A should pay contributions on the money paid the blacksmith, nor that the smith should be eligible for benefit compensations under the act as now written. The blacksmith performs his task of shoeing the horse and sharpening the plow point according to his own

methods and ideas without direction or control from A, who may leave the shop while the work is done, relying and depending upon the smith's superior knowledge and ability. The work is done away from all places of business of A,—and the smith is customarily engaged in an independently established trade, to wit, blacksmithing. Other illustrations are the shoe shiner; the auto-mechanic who repairs or overhauls a car; the dentist; the butcher who cuts the deer the hunter brings in; the plumber who cleans out the drains and perhaps replaces parts of the plumbing; the C. P. A. who comes in and audits the books; and the barber who cuts the hair, gives a shave, massage and shampoo; and the surgeon performing an operation on the patient. In these simple illustrations, such people all render personal service for a remuneration, but they are free from control in the doing of the service, that is, they are their own bosses as to how they do it; they perform services outside the employer's place of business, or outside the usual course of his business, and they are all customarily engaged in an independently established trade, business or profession. * * * *

"The adverb 'independently' clearly modifies the word 'established', and must therefore carry the meaning that the 'business' or 'trade' was established independently of the employer or the rendering of the personal service forming the basis of the claim. * * * * 'Customarily' means usually, habitually, according to the customs, general practice or usual order of things, regularly."

Consequently we may consider as the chief aspect of the problem before us for solution whether or not there is any substantial evidence in the record at bar such as would authorize the district court of Sheridan County to find that the musicians rendering their services under the circumstances above detailed in the Palace Gardens were "free from control or direction over the performance of such service" by Mathews or Wallace, both under their contracts of service and in fact, this being the requirement of "(i) (5) (A)" under the law as it now reads and one of three factors declared by

such law to be considered in determining whether an individual is employed within the terms of the Act. Ita lex scripta est: "Services performed by an *individual* for wages shall be deemed to be employment subject to this Act" unless these three requirements "(5) (A)", "(5) (B)" and "(5) (C)", supra, can be affirmatively established. Assuming therefore, as some of the decisions cited above would seem to intimate, that these three factors are the only ones to be considered in determining who is an employer under the statute, we proceed to examine them:

While it is apparent that in some minor respects Mathews and Wallace controlled them, it is clear that for the most part the musicians composing these several bands and orchestras were not subject to the owner's directions. The leader of the orchestra and he alone contracted with the owner; he procured the services of those who worked with him; they all supplied their own musical instruments, except the piano; he ordinarily determined what music they would play and how they would play it; he could and did "hire and fire" those who worked with him. He ordinarily determined, except as arranged for with the owner before the service commenced, when intermissions would be taken; and if he received money to pay the other members of the orchestra and did not, they had the right to look to him for payment; he was responsible for their compensation.

As to the second factor "(5) (B)" provided by the law aforesaid, it appears to be in the alternative and the service rendered must be either "outside the usual course of the business for which such service is performed" or the service must be "performed outside of all places of business of the enterprise for which such service is performed".

Concerning the last of these alternatives, it is clear we think that the musicians performed their services,

during the time the leaders' contracts with the owner were operative, within the place of business of the owner and not outside of it. As to the first alternative the query must be—"Was the service rendered by these orchestras 'outside the usual course of the business' of the Palace Gardens?" This query we think must be answered in the affirmative.

In Cummings v. Union Quarry & Construction Co., 231 Mo. App. 1224, 87 S. W. (2d) 1039, the court said:

"Under section 3308 (a), supra, any person who has work done under contract on or about his premises, which is an operation of the usual business which he there carries on, is to be regarded as a statutory employer of such contractor, and as such liable to him for compensation for an injury received by him on or about the employer's premises while doing work which was in the usual course of the employer's business. * * * *

"In this case, the undisputed facts show that defendant's usual business was that of quarrying and selling rock, and that while it was indeed necessary that the cables used in the work be painted and greased at intervals of two years, still defendant had no regular employee for such task, but instead regarded the same as a specialty job for the doing of which it contracted independently with some outside person such as plaintiff whenever the necessity for the doing of the work arose. Under such circumstances, in the light of reason and the precedents set by other jurisdictions, we must hold that plaintiff, when injured, was not engaged in any part of defendant's usual business within the contemplation of section 3308(a), which would control if the case were one for compensation, and that consequently his cause of action is wholly and exclusively one for the common law to adjudicate."

In Holbrook v. Olympia Hotel Company, 200 Mich. 597, 166 N. W. 876, the principal question was whether H., injured while employed by the hotel company to do some painting and paper hanging, was in the usual course of the business of his employer under a statute

which was inapplicable to persons "whose employment is but casual or is not in the usual course of the trade, business, profession or occupation of his employer". Indicating what the court thought was not in the usual course * * * of the business * * * of his employer, this was said:

"It is clear that the law contemplates that there may be an employment of labor, not in the usual course of the business of the employer, in which employment the risks of injury not occasioned by the employer's fault are assumed by the workman. It would seem that occasionally renovating the rooms of a building, or the building itself, owned and occupied by the owner as a home, with paint or paper or both, is not in the usual course of the trade, business, profession or occupation of the owner, unless he is himself in the business of painting and decorating. No reason can be found for concluding that the owner of a hotel is pursuing his business, within the meaning of the law, when he causes the rooms to be occasionally painted and decorated, although it is usual to have work of that nature done from time to time."

And in Lamont v. Intermountain Realty Co., 48 Wyo. 56, 41 P. 2d 497, this court held that a workman employed by the hour to do a special job of painting in a building in which his employer conducted a hotel, was not employed in "the usual course of his employer's business" and it was suggested:

"The truth is, that, in the case at bar, the business or trade of painting was that of the workman herein, as he himself testified, not that of the owner of the hotel, and while the evidence in the case is, perhaps, too meager to say definitely, it would almost seem that he should be considered in the nature of an independent contractor."

While these cases are decisions dealing with liability under Workmen's Compensation Laws, it would appear that they are helpful in determining the meaning of the language of the Act quoted above and here in-

volved. Why should similar language in the Unemployment Compensation Law be construed differently? It is plain that many and perhaps most of the hotels and restaurants are conducted in this state without the use of music at all. It is not essential to the business of a hotel that music be used in connection therewith. It can be so used, of course, but it can hardly be regarded as within "the usual course" of the restaurant or hotel business, like dishwashing or cooking, for example. If a restaurant owner contracts with a florist to supply flowers for his tables, is that a service within the "usual course" of the owner's business? Flowers on the restaurant tables give pleasure to the owner's guests as does music played by those who can be hired to supply it in the restaurant rooms. Are the florist and those employed by him employees of the owner? We are inclined to think not.

Regarding the third factor, "(5) (C)", supra, the query must be—"Were the leaders of these orchestras or bands and their associates performing in the Palace Gardens 'customarily engaged in an independent, established trade, occupation, profession or business'?" This query also must, we think, be answered in the affirmative. It needs no argument to establish that these bands or orchestras, which were privileged to work any other time and place their leaders agreed to supply their services so long as such engagements did not conflict with the arrangement made with the owner, were "customarily engaged" in a "profession" which was established independently of the owner's restaurant.

The latest case which we have been able to find and one we regard as more closely in point herein than any other is that of Hill Hotel Co. v. Kinney, Commissioner of Labor et al. (Neb.) 295 N. W. 397, (opinion filed Dec. 20, 1940). In this case one E. sought unemployment benefits chargeable against the account of

the Hill Hotel Co. His claim set forth that claimant with three other musicians, performing under the leadership of one Bobby Bowman, had, as employee of the hotel company, furnished music from May, 1938, until January, 1939. The claim was opposed on the ground that E. was not an employee of the hotel company and that the music was furnished by Bowman, an independent contractor. The appellate tribunal of the unemployment compensation division of the Nebraska department of labor allowed the claim. The hotel company carried the case to the district court for Douglas County, where the claim was disallowed. E. then brought the case on appeal to the Supreme Court of Nebraska.

The court, after stating that the question presented was whether E. was an employee of the hotel company within the meaning of the Nebraska unemployment compensation law (Comp. St. Supp. 1939, §§ 48-701 to 48-721), set forth the following provisions of the law:

"Services performed by an individual for wages shall be deemed to be employment subject to this Act unless shown to the satisfaction of the commissioner that: (A) Such individual has been and will continue to be free from control or direction over the performance of such services, both under his contract of service and in fact; and (B) Such service is either outside the usual course of the business for which such service is performed or such service is performed outside of all the places of business of the enterprise for which such service is performed; and (C) Such individual is customarily engaged in an independently established trade, occupation, profession, or business." Laws 1937, ch. 108, sec. 2; Comp. St. Supp. 1939, sec. 48-702.

Referring to the fact that "the provisions quoted from the Nebraska law" were to be found in the unemployment compensation law of the State of Washington, the Nebraska court quotes the excerpts we have set

forth above from the opinion of the Washington Supreme Court in Washington Recorder Publishing Co. v. Ernst, supra. Concerning that case the Nebraska court expressed its views thus:

"In that case the statute was considered at great length and many authorities cited. While there is a diversity of views among the courts on this subject and the opinions are not always unanimous, the weight of authority is that legislatures in enacting unemployment compensation statutes did not intend to depart from the common-law definition of 'independent contractor'. * * * *

"In both the workmen's compensation law and the unemployment compensation law the lawmakers legislated on labor problems and it should not be held without sound reasons that they intended to vary the status of independent contractors under the two intimately related statutes. The point in controversy was elaborately argued by counsel on each side with reference to statutes, opinions of courts and rulings of preliminary tribunals. It was earnestly insisted on behalf of claimant that the legislature had power to change the common law adopted in this state and make legislative definitions applicable to new enactments; that such power was exercised in the present instance, but that, even if the common-law tests are applied, claimant is entitled to an allowance for unemployment compensation under the facts. Though the argument is plausible, the rulings quoted from the supreme court of Washington seem to be based on better reasons and precedents and are adopted for the purpose of a decision on this appeal."

Reverting to the facts involved, the opinion states that Bowman entered into a written contract with the hotel company to furnish for it in its hotel in Omaha music by four musicians, members of the Omaha Musicians' Association, said contract providing for services for a minimum number of hours per week, specified rates of pay and a total period during which said services were to be rendered; that E. was not a party to the contract; that music was furnished at the hotel

by Bowman as leader, E., the claimant for unemployment compensation, and two other musicians, each of whom played a musical instrument; that the organization was variously known as "Bobby Bowman's Band" and "Bobby" Bowman's Orchestra" and "Bobby Bowman's Syncopators".

The court outlined Bowman's testimony in the case to the effect that he entered into the contract with the hotel company in the form used by the musicians' union; that the union scale of wages was specified; that he received weekly from the hotel company pay for himself and the other three musicians and paid to each his share; that J., the hotel manager, always gave him instructions, among them when to play and when to quit, manner of playing, type of music and times for intermissions; that these instructions to him as leader were passed on to the other players; that with the exception of a piano furnished by the hotel company, the musical instruments were owned by the players; that they quit playing at the hotel when their contract expired and later the organization, with some of the same players, furnished music at different times and places but not continuously.

The testimony of J., the hotel manager, was stated as follows: That he employed the Bobby Bowman Band; that he never at any time employed E. or discussed with him the matter of employment or compensation; that he did not talk to any member of the orchestra about what instruments to play or how to play them, or what uniforms to wear; that he did not criticize their work and had nothing to do with the personnel of the orchestra; that he told them the starting time and the quitting time and may have told Bowman to cut down the time for playing and may have cautioned them not to loiter around the place or disturb guests or employees of the hotel; that he paid Bowman by check for the entire cost of the music;

that he never made any payment to any member of the band; that he never deducted anything for unemployment insurance; that he had nothing to do with rehearsals and had no contract with E.; that he never controlled any individual service of E. or of any other member of the band; that he did not discharge Bowman, the time limit of his contract ran out and then Bowman and the other musicians left.

E. testified also, his testimony being in some respects conflicting with that given by J. In affirming the action of the district court, without dissent, the two closing paragraphs of the opinion read as follows:

"In many material respects the evidence is not conflicting. In so far as the testimony of Elmore and Bowman conflicts with that of Josephson, credence was given to the latter by the trial judge who saw the witnesses and heard them as they testified. His ruling is adopted on appeal, since it is in harmony with the general import of circumstances and events disclosed without dispute. Josephson did not direct the technique of the musicians in the performance of their duties under the contract between Bowman and the hotel company or employ Elmore or direct him in the performance of his professional duties or discharge him. The relation of independent contractor was not disproved by evidence that Josephson instructed Bowman in regard to his duties under the contract, insisted on proper behavior in the hotel and cautioned the musicians not to loiter around the place or disturb guests or employees of the hotel. Reader v. Kimball Laundry, 129 Neb. 306, 261 N. W. 562.

"In the better view of the entire record considered in connection with the unemployment compensation law and with the weight of judicial interpretation, Elmore was not an employee of the Hill Hotel Company but was an employee of Bobby Bowman, an independent contractor. It follows that the claim for unemployment compensation was properly disallowed by the district court."

The Hill Hotel Co. case would appear to disclose a control over the musicians somewhat greater than in the case at bar.

We have seen that even if the three factors above considered, viz., "(A)", "(B)" and "(C)" of subdivision "(i) (5)", supra, are viewed as the sole tests to be applied as to whether the owner in the instant case was an employer of these orchestras and bands under the unemployment compensation law of this state, we have reached the conclusion that he was not. However, if we adopt the views of the New York, Mississippi, Washington, Wisconsin and Nebraska courts and determine the case tested by whether or not the leaders of these several orchestras and bands were independent contractors, we are inclined to think they were and so arrive at the same result. Under the definition of an independent contractor as reveiwed by the editors of the Restatement of the Law of Agency, Vol. 1, § 220, pages 483-485 and quoted in the Washington Recorder Publishing Co. case, supra, the leaders aforesaid were, we are convinced, to be regarded as such independent contractors. At least there was substantial evidence in the record at bar to authorize the district court to thus find and it did so find. See also Stockwell v. Morris, supra, and Lamont v. Intermountain Realty Co., supra.

We must strongly emphasize, however, that each case of this character must be decided upon its own set of facts. It is impossible to lay down a general rule and the case at bar may not be regarded as a precedent or controlling force in all litigated matters of this character.

The defendant and respondent Mathews has moved to dismiss the appeal in this cause for the reason that notice of appeal to this court is defective in not expressing a present act as contemplated by Section

89-4902 W. R. S., 1931, said notice of appeal reading: "You are hereby notified that Plaintiff, The Unemployment Compensation Commission of Wyoming *will* appeal to the Supreme Court of Wyoming," etc. We regard this contention as without merit. Notices of appeal should be construed with reasonable liberality and are sufficient if it reasonably appears that an appeal is intended. 4 C. J. S. 1059 and cases cited. It is quite plain that everyone concerned understood that an appeal from the judgment below was intended.

In the case of Ex parte Hollon Parker, 120 U. S. 737, 7 S. Ct. 767, 30 L. Ed. 818, a notice of appeal read:

"To John F. Boyer, one of the defendants in the above entitled cause:

"You will please take notice that your codefendant, Hollon Parker, in the above entitled action, will on this the 19th day of June, 1882, file a notice of appeal and stay bond, and appeal said cause to the Supreme Court of Washington Territory, holding terms at Olympia, July Term, 1883, and you are herewith requested to join in said appeal."

And the court said:

"This was a notice of a present intention to appeal, with a request to Boyer, as a codefendant, to join in it." See also In re Day, 18 Wash. 359, 51 P. 474.

It is our opinion accordingly under the authorities cited above that the judgment of the district court of Sheridan County should be affirmed, the record not presenting reversible error.

*Affirmed.*

BLUME, J. (concurring)

I concur in the opinion of the Chief Justice. There is no doubt that under our unemployment compensation law, the general intention is that one who deals with an independent contractor is not required to pay

the contributions mentioned in the law. I am not willing to assume, in the absence of a more specific provision in the law, that the legislature did not intend to establish a uniform rule in such cases. There is not the slightest doubt that the restaurant keeper in this case was dealing with an independent contractor. The law is new. Experience may teach us many things, and if it is here-after found that the uniformity above mentioned is not required, and should in cases such as is now before us, or in similar cases, be ignored, the legislature can easily correct the statute.

RINER, Ch. J., concurs in this opinion.

KIMBALL, J. (dissenting)

I am unable to concur. It is held that the musicians who acted as leaders or contractors pursuant to a union rule requiring that some member of the orchestra should act in that capacity, were employers of the other musicians (never more than three, sometimes only one) who, with the leader, played in defendant's "Palace Gardens," described in the above opinion. An unhappy result that would seem to follow is that the leaders or contractors will not be entitled to benefits under the act. I think we should hold that all the members of the orchestra performed for defendant service that was "employment" subject to the act.

The pertinent provisions of the act are quoted in the above opinion. It is conceded that defendant was an employer as defined by section 2(h), and that the musicians performed service for wages. Section 2(i) (1). Section 2(i) (5) provides:

"Services performed by an individual for wages shall be deemed to be employment subject to this Act unless and until it is shown to the satisfaction of the Commission that—

"(A) such individual has been and will continue to be free from control or direction over the performance

of such services, both under his contract of service and in fact; and

"(B) such service is either outside the usual course of the business for which such service is performed or that such service is performed outside of all the places of business of the enterprise for which such service is performed; and

"(C) such individual is customarily engaged in an independently established trade, occupation, profession or business."

Similar provisions are found in the unemployment compensation laws of many of the states, and have been considered by the courts in Washington Recorder Pub. Co. v. Ernst, 199 Wash. 176, 91 P. (2d) 718, 124 A. L. R. 667; Wisconsin Bridge & Iron Co. v. Ramsay, 233 Wis. 467, 290 N. W. 199; Hill Hotel Co. v. Kinney (Neb.) 295 N. W. 397; Industrial Comm. v. Northwestern Mut. L. Ins. Co., 103 Colo. 550, 88 P. (2d) 560; Globe Grain & Milling Co. v. Ind. Comm., 98 Utah 36, 91 P. (2d) 512, 97 P. (2d) 582; Singer Sewing Mach. Co. v. Comp. Comm. (Ore.) 103 P. (2d) 708; Unemployment Comp. Comm. v. Jefferson, 215 N. C. 479, 2 S. E. (2d) 584; Young v. Bureau of Unemp. Comp. (Ga. App.) 10 S. E. 412; Schomp v. Fuller Brush Co., 124 N. J. L. 487, 12 Atl. (2d) 702; McKinley v. R. L. Payne & Son Lbr. Co. (Ark.) 143 S. W. (2d) 38, and (under the Illinois law) In re Mid America Co., 31 F. Supp. 601.

The cited Washington and Nebraska cases hold, as stated in Washington Recorder Publishing Co. v. Ernst, supra, and quoted with approval in Hill Hotel Co. v. Kinney, supra, that: "In drafting the statute the legislators attempted to codify the common law. They intended that the common law test of employment relationship should likewise be the test under the Unemployment Compensation Act." Perhaps Wisconsin Bridge & Iron Co. v. Ramsay, supra, a case difficult to summarize, supports this view.

The other cases cited above, in construing acts containing provisions like sections 2(i) (1) and 2(i) (5) of our act, hold, in effect, that the statute itself contains a complete definition of "employment" as used in the act, and that an employer of individuals who perform service for wages must make the required contributions unless it is shown that the conditions set forth in subsections (A) (B) and (C) existed. The burden of proof is on the employer who resists payment, and the issue is not whether the employed individuals were independent contractors under general law, or whether the common law relation of master and servant existed, but whether the service performed was "employment" as defined by the statutes.

This disagreement in the cases construing similar statutes in other jurisdictions is noted in the majority opinion without deciding which view is supported by the better reasons. It is held that the evidence was sufficient to support a finding not only that the leaders or contractors were independent contractors under general law, but also that all the conditions set forth in subdivisions (A) (B) and (C), supra, existed.

I do not care to express a doubt that the evidence was sufficient to support a finding that the orchestra leaders or contractors were "independent contractors" under the general law of master and servant, but I do not think it was sufficient to support a finding of the existence of all the conditions stated in subsections (A) (B) and (C). In my opinion, therefore, it becomes necessary to decide definitely whether we follow the Washington and Nebraska cases, holding that the test of employment under the act is that of general law, or the other cases holding that the test is that stated in the statute. I think we should follow the cases last referred to, for reasons stated therein which I shall not repeat.

On the question of the sufficiency of the evidence to show the existence of the conditions stated in subsections (A) (B) and (C), I shall refer only to the evidence relevant under subsection (B), for it is there that I think there was a clear failure of proof. This subsection states two alternative conditions, and one or the other must be shown in order to exclude the employment from the .act. We agree that the second alternative condition was not shown. It therefore was incumbent on defendant to show that the service performed by the musicians was "outside the usual course of the business for which such service was performed."

The facts showing the nature of defendant's business and of the musicians' service are stated in the majority opinion. The only omitted fact that seems material is that musicians had been employed by defendant to perform service of this kind for at least three years preceding the trial. The service was performed regularly and for the obvious purpose of attracting and entertaining customers. I do not think there is a sufficient reason for holding that the service was outside of the usual course of the business.

No case exactly in point on this question has been found, unless it be Rossini v. Tone, 7 Conn. Supp. 13, a decision by a Connecticut superior court under the unemployment compensation law of that state, wherein it is said that: "The service rendered by the musicians was as much a part of [the restaurant] business as that rendered by the waiter or the dishwasher." Several other cases considering the status of musicians performing service in restaurants have been mentioned. In some of these cases it was held that the musicians were employees of the restaurant owner; in others, that they were employees of an independent contractor; and it seems of some significance that it does not appear in any case that it was contended that the service was not in the usual course of the business

of the restaurant owner. There are cases holding that the unauthorized playing of copyrighted music by an orchestra under similar circumstances was "for profit," because the furnishing of music was a part of a business in which the proprietor made, or expected to make, a profit. Herbert v. Shanley Co., 242 U. S. 591; Sarpy v. Holland (1908) 2 Ch. 198, 213. Under Workmen's compensation laws it has been held that a workman was acting within the usual course of his employer's business while entertaining customers or prospective customers of the business. Commercial Casualty Ins. Co. v. Strawn (Tex. Civ. App.) 44 S. W. (2d) 805; Solar-Sturges Mfg. Co. v. Industrial Comm., 315 Ill. 352, 146 N. E. 572. Also, that setting off fireworks on the fourth of July to attract "crowds and patronage" to a "pleasure resort" was in the usual course of business of the proprietor of the resort. Hasenfus v. Industrial Comm., 184 Wis. 281, 199 N. W. 158.

My views as expressed above were put in writing and submitted when it was thought that the grounds of the decision were fully stated in the opinion by the Chief Justice. Later, the opinion by Justice Blume in which the Chief Justice concurs, was submitted. In that opinion it seems to be decided that employment within the act does not include service performed by an independent contractor under the general law of master and servant, and my statement above that that question is not decided is inaccurate.