VICKERS, J. pro tem.
 

 The defendant was charged under Counts I and II of the complaint with violating section 101.5 of the Unemployment Insurance Act, in that, being a person subject to and liable for the payment of contributions to the Unemployment Fund, he wilfully and unlawfully failed to make such contributions for the second and third quarters of the year 1940. He was also charged under Count III of the complaint with violating section 101(e) of the same act, in that being an employing unit, he wilfully and unlawfully failed and neglected to furnish the Unemployment Reserves Commission with a report required by said commission showing the names, social security numbers and wages paid each person employed by him for the first quarter of the year 1941.
 

 The case was submitted to the trial court, a jury having been waived, upon a stipulation of facts, the substance of which is hereinafter set forth. The defendant was adjudged guilty by the court on each count and sentenced to pay fines with the alternative of imprisonment.
 

 An examination of the stipulation of facts discloses no evidence that the defendant failed to make the contributions alleged to have been due from him as charged in Counts I and II of the complaint or that the commission required any report from him, as he is charged by Count III of the complaint with having failed and refused to furnish. Since each of these facts must be proved in order to establish a violation of said sections 101(e) and 101.5 respectively, as charged by the respective counts of the complaint, the judgment of the trial court must be reversed as to all of them. However, in view of the importance of the only questions argued by counsel in their briefs, and because such questions will necessarily be presented on a new trial, we will proceed to consider them for
 
 *Supp. 844
 
 the assistance of court and counsel. These questions are: (1) Was the relationship between the defendant and¡ the members of his orchestra that of employer and employee or were they partners or joint adventurers ? (2) Was the relationship between the defendant and the establishments for which he and his orchestra played that of employee and employer or was he an independent contractor ? Another way of putting the above question is, was the defendant an employing unit under the act in question?
 

 Section 101.5 of the Unemployment Insurance Act (Stats. 1935, p. 1226, Act 8780d Deering’s General Laws) reads as follows:
 

 “It is a misdemeanor for any person to wilfully fail or refuse to make any contributions to the unemployment fund which are due under this act.”
 

 Section 101(e) of the same act reads as folloivs:
 

 11 Section 101. It is a misdemeanor:
 

 (e) On the part of any employing unit, or any officer or agent of an employing unit, wilfully and unlawfully to fail or neglect to furnish to the commission reports required by it when necessary for the enforcement of this act.”
 

 The stipulation of facts is a lengthy one, the substance of which, so far as pertinent to the questions involved, is as follows:
 

 That prior to September of 1939 for some seven years the defendant had been a musician, either playing in orchestras conducted by other persons or leading orchestras under his own organization. That in September, 1939, the defendant assembled an orchestra of twelve musicians, including himself, and one woman singer, which orchestra was known as “JIMMIE GRIER AND HIS ORCHESTRA.” That the understanding and agreement between the defendant and the other members of his orchestra were as follows: (a) that the defendant had a contract with the Music Corporation of America, a booking agency licensed under the Federation whereby the said agency agreed to render its services in obtaining engagements for the defendant and his orchestra which he would assemble; (b) that the assembled orchestra agreed to operate under said contract with the Music Corporation of America; (c) that each member thereof would own and supply his own instruments, except piano, and his own uniform, the style to be selected by vote of the orchestra; (d) that the defendant should furnish the music library; (e)
 
 *Supp. 845
 
 that the defendant should contract for engagements and appearances and set the terms thereof; (f) that the compensation paid for engagements and appearances should be handled by the defendant, who would pay out of the proceeds: (1) to each member of the orchestra an amount at least equal to the scale of compensation set by the Federation; that defendant determine and set the amount that any member receive above the said scale; (2) to pay the dues and other charges fixed by the Federation; (3) to pay the amounts set by the Federation for transportation charges; (4) to pay the other normal expenses of the orchestra, as such; (5) that the balance of the money should be retained by the defendant as his compensation for the services he rendered; (g) that the defendant should act as leader of the orchestra and as such should fix the time and place for rehearsals and direct other matters of the kind; (h) that in the event any member was unsatisfactory to defendant, he had the power to discharge such member and to select a new member, provided each new member of the orchestra enter into the organization under the same terms and conditions as the original members. That the orchestra played at many hotels, restaurants, night clubs, and other similar places, playing popular music; that all engagements were secured by the Music Corporation of America under written contract signed by said corporation as representative of the defendant, a duplicate copy of which was received in evidence as Exhibit C; that the Music Corporation of America’s representative, upon obtaining the signature to each contract, collected 50 per cent of the contract price, from which it deducted its commission and delivered the balance to the defendant in cash, the balance of the contract price being paid to the defendant at the time of performance; that the defendant deposited none of this money in a bank account but divided the money amongst himself and the other orchestra members, as per the above agreement, this resulting in each member of the orchestra, including the defendant, receiving not less than the scales of compensation and expenses set by the Federation (this part of the stipulation is controverted in Exhibits D, E and F hereinafter referred to, which disclose that on occasions the defendant suffered a financial loss) ; that from April to December, 1940, there were twenty changes in personnel of the orchestra, occasioned as a result of the voluntary quitting of the members
 
 *Supp. 846
 
 and the filling of such vacancies by such additions as defendant desired.
 

 The stipulation of facts further recites that the establishments at which the orchestra performed did the following things: (a) determined the number of musicians to play; (b) owned and controlled the premises at which the services were performed; (c) designated the specific place for the performance; (d) gave the defendant, as leader of the orchestra, specific directions covering what the establishments required or expected of the leader of the orchestra; (e) prescribed the route and the manner whereby the members of the orchestra reached and left the orchestra stand; (f) gave orders as to the conduct of the orchestra mjembers during intermissions and rest periods; (g) required the orchestra to coordinate and conform to the convenience of the establishment in the service of food and beverages and the schedule of floor shows or other entertainment specially employed in the establishment; (h) limited the time and place of rehearsals on the premises; (i) required the orchestra to rehearse with other artists specially employed by the establishments; (j) required the orchestra to play home-town music not contained in their library; (k) required the leader to act as master of ceremonies, to introduce local celebrities and to take part in activities not included in the rendition of dance music; (1) required the orchestra members to wear a particular uniform; (m) required the orchestra to play certain types of music, such as more or less waltzes, faster or slower pieces, long or short pieces, and control the volume, all as the operator of the establishment might desire. None of the various establishments where defendant and his orchestra played had any authority to: (a) determine or control the amount of compensation defendant paid to each or any member of the orchestra; (b) hire or discharge any member of the orchestra; (c) determine or control the arrangement or instrumentation of any of the musical selections played from defendant’s library.
 

 As part of the stipulation of fact, Exhibits D, E and F were received in evidence. They consist of statements showing the various amounts received and disbursed by the appellant for the second, third and fourth quarters of 1940 as a result of the various engagements. An examination of these exhibits discloses that while the various members of the orchestra received fairly constant amounts as a result of each
 
 *Supp. 847
 
 engagement, the amounts received by appellant varied greatly. For the second quarter the members received $6,924.56 and the appellant $2,236.16. For the third quarter the members received $5,732.77 and the appellant nothing— in fact lost $42.46. For the fourth quarter the members received $1,996 and the appellant $1,102.50.
 

 The parties further stipulated that when the defendant filed returns upon forms required by law indicating that he had been an employer during the second and third quarters of the year 1940, he did so under the belief that he was at that time an employing unit as defined in said act; that defendant did not furnish any reports to the Unemployment Commission during or covering the first quarter of 1941, or any portion thereof, nor did he file with the commission a written application for termination of coverage; and that the defendant was at all times alleged in the complaint a resident of Los Angeles and that certain of the places referred to in Exhibits D, E and F, where defendant and his orchestra had played, were located in Los Angeles.
 

 The answers to the two questions raised by this appeal are found in certain sections of the Unemployment Insurance Act and in decisions of the courts of this state and those of New York, which state has an Unemployment Insurance Act comparable to ours insofar as the questions before us are concerned. The pertinent portions of sections 6.5 of the act read as follows: “‘Employment,’ subject to the other provisions of this act, means service . . . performed for wages or under any contract of hire, written or oral, express or implied.” The pertinent portions of section 9 of the act define “employer” and “employing unit” as follows: “ ‘Employer’ means: (a) Any employing unit, which for some portion of a day, but not necessarily simultaneously, in each of twenty different weeks, whether or not such weeks are or were consecutive, has within the current calendar year or had within the preceding calendar year in employment four or more individuals, irrespective of whether the same individuals are or were employed in each such day; ... (e) ‘Employing unit,’ as used in this act, means any individual or type of organization . . . which has ... in its employ one or more individuals performing services for it within this State . . . Each individual employed to perform or to assist in performing the work of any individual employed by an employing unit shall be deemed to be employed by such em
 
 *Supp. 848
 
 ploying unit . . . whether such individual was hired or paid directly by such employing unit or by such individual so employed, providing the employing unit had actual or constructive knowledge of the work.”
 

 Section 37 of the act, after providing for the accrual of the employer’s contributions, declares: “Such contributions shall become due and be paid to the commission for the unemployment fund by each employer in accordance with such regulations as the commission may prescribe, and shall not be deducted in whole or in part, from the wages of individuals in his employ.”
 

 It will be seen that the Legislature has not endeavored to distinguish between an employer and independent contractor, nor between the relation of employer and employee and that of partners or coadventurers. For these distinctions we look to the cases.
 

 In the case of
 
 Western Indemnity Co.
 
 v.
 
 Pillsbury,
 
 (1916) 172 Cal. 807 [159 Pac. 721], the court laid down certain principles for determining whether or not a person was an employee or an independent contractor. These principles have been recognized and quoted with approval by our courts ever since when dealing with a similar problem. In that case the Industrial Accident Commission had found that a certain Mr. Stevens was an employee and therefore entitled to an award under the Compensation Act. The Supreme Court determined that Stevens was an independent contractor and annulled the award. In doing so, the court said (p. 810) : “. . . but there could be no employee unless his personal services were rendered to the employer, and since wages are generally paid for personal services, wages or salary are made the criteria of compensations given to injured employees. The word ‘servant’ is generally synonymous with the word ‘employee’.” Again (p. 811), “But it is urged . . . that the test of what constitutes independent service lies in the control exercised ... It is true that many authorities specify ‘control’ of the person performing work as a means of differentiating service from independent employment. The test of ‘control,’ however, means
 
 'complete
 
 control.’ . . . Labatt, in his work on ‘Master and Servant,’ second edition, section 25, says: ‘It is well settled that, where one person is performing work in which another is beneficially interested, the latter may exercise over the former a certain measure of control for a definite and restricted pur
 
 *Supp. 849
 
 pose, without incurring the responsibilities, or acquiring the immunities, of a master, with respect to the person controlled. ’ ” Again (p. 813), “It has been said that the true test of a contractor is that he renders service in the course of an independent occupation, following his employer’s desires in the results but not in the means used (1 Shearman & Redfield on Negligence, 6th ed., 396), but in weighing the control exercised we must carefully distinguish between authoritative control and mere suggestion as to detail or the necessary co-operation where the work furnished is part of a larger undertaking.”
 

 In the case of
 
 Brosius
 
 v.
 
 Orpheum Theater Co., Ltd.,
 
 (1936) 16 Cal. App. (2d) 61 [60 P. (2d) 156], the plaintiff recovered a judgment for damages by reason of the defendant’s negligence due to a fall while he was performing a comedy cycling act that was one of a number of vaudeville acts on the program. The plaintiff and his partner were engaged by the defendant under a written contract. The defendant had interposed the defense that the plaintiff was an employee of the defendant as defined by section 8 of the Workmen’s Compensation Act, and that therefore his sole means of redress was by application to the Industrial Accident Commission. The defendant introduced in evidence the contract of employment. Among other things, this contract provided the length of employment, the time, the number of performances, the salary, the right of the defendant to cancel any part of the engagement because of impropriety or suggestive part of the act, if the plaintiff refused to eliminate same when requested; that the plaintiff was to present the act or specialty of himself and partner in their usual customary manner; that the plaintiff was to abide by all reasonable rules and regulations prescribed by the defendant; and that the plaintiff was to be present for rehearsals at the usual time for holding same at the theater. The reviewing court affirmed the judgment, citing cases, particularly
 
 Western Indemnity Co.
 
 v.
 
 Pillsbury, supra,
 
 and quoted with approval a portion of the language of that case, excerpts of which appear above. The court stated: “The provision requiring plaintiff to be present at rehearsals does not establish complete control. Plaintiff’s act being one of several, orderly conduct of the theater would require that all the acts be rehearsed together for the purpose of co-ordinating the
 
 *Supp. 850
 
 entire performance and synchronizing the acts with the music of the orchestra and the work of the employees of the theater. The provisions obligating plaintiff to abide by ‘all reasonable rules and regulations’ is a requirement which, in view of defendant’s business, would naturally be imposed on independent contractors and employees alike.”
 

 The case of
 
 Winther
 
 v.
 
 Industrial Accident Com.,
 
 (1936) 16 Cal. App. (2d) 131 [60 P. (2d) 342], was, as the title indicates, another case involving an award of the Industrial Accident Commission. The reviewing court annulled the award. In doing so, it quoted from
 
 Western Indemnity Co.
 
 v.
 
 Pillsbury, supra,
 
 as to the meaning of the phrase “right of control,” as a determining factor in establishing the relationship of employer and employee. The court said: “The test of control in such cases means ‘complete control’ or the full and unqualified right to control and direct the details of or the means by which the work is to be accomplished.” The court thereupon also approved the language in Labatt on “Master and Servant,” which we have quoted earlier in this opinion, and went on to declare, at pages 137 and 138, as follows: ‘ ‘ The right of discharge is a fact that undeniably has a bearing on the question of authoritative control. If such right is unlimited so that it may be exercised arbitrarily, it is a fact which obviously points in the direction of that completeness of control which the decisions recognize as ‘one of the best tests’ of the relationship between individuals in the matter under discussion ...”
 

 In the case of
 
 Bohanon
 
 v.
 
 James McClatchy Pub. Co.,
 
 (1936) 16 Cal. App. (2d) 188 [60 P. (2d) 510], the plaintiff recovered a judgment against McClatchy Co. and one Engebrecht for injuries caused by the negligence of the latter who, at the time of the accident, was delivering newspapers for the defendant corporation under a written contract. In affirming the judgment as to Engebrecht, but reversing it as to the publishing company on the ground that Engebrecht was an independent contractor, the court said: “It may now be regarded as settled in California that the control which has been adopted as the test by which the relationship between two persons is to be measured for the purpose of discovering whether such relationship is that of master and servant is complete or unqualified control. . . . When one person is performing work in which another is beneficially interested, the latter is permitted to exercise a
 
 *Supp. 851
 
 certain measure of control for a definite and restricted purpose without incurring the responsibilities or acquiring the immunities of a master, with respect to the person controlled.” (Citing
 
 Western Indemnity Co.
 
 v.
 
 Pillsbury, supra,
 
 and other cases.)
 

 Counsel have cited a number of New York cases involving the relationship between an orchestra leader and the members of his orchestra on the one hand, and the establishment for which they played on the other. One of the latest of such cases in point of time is that of
 
 Claim of Miller, Appeal of Amigone,
 
 (July 1941) 262 App. Div. 385 [29 N. Y. S. (2d) 15]. In that case a night club owner, Amigone, appealed from a decision of the Unemployment Insurance Appeal Board that had affirmed a decision of its referee holding that Miller, a member of Royal Worth’s orchestra, was an employee of appellant. Worth, during the period in question, was under contract with appellant to furnish an orchestra to play, and which did play, in appellant’s night club. Under the facts as stated by the court, the contract provided that Worth furnish an orchestra consisting of twelve men to play at the club between certain hours daily, for a four weeks’ period, for $750 per week. The orchestra was not assembled or organized for the purpose of playing at that night club but was a completed unit before the execution of the contract. Worth evidently intended it to be a permanent organization which he expected would rapidly gain recognition. The orchestra included a number of expert musicians whose services were obtained by Worth. Appellant had no supervision over the members and no authority to direct or control their actions, and could not employ or discharge plaintiff. Appellant paid Worth and Worth paid the members of his orchestra. After reviewing the above facts the court said: “From the proof in this record there cannot be the slightest doubt that Worth was an independent contractor and that claimant and the other members of his orchestra were his employees.” (Citing cases.) “Although it is apparent from an examination of cases involving the independent contractor relationship that there is no absolute rule for determining whether one is an independent contractor or an employee, and that each case must be determined on its own facts, nevertheless, there are many well recognized and fairly typical indicia of the status of an independent contractor, even though the presence of one
 
 *Supp. 852
 
 or more of such indicia in a case is not necessarily conclusive. It has been held that the test of what constitutes independent service lies in the control exercised, the decisive question being as to who has the right to direct what shall be done, and when and how it shall be done. Practically every contract for work to be done reserves to the employer a certain degree of control, to the end that he may see that the contract is performed according to specifications. The employer may exercise a limited control over the work without rendering the employee a mere servant, for a relation of master and servant is not inferable from a reservation of powers which do not deprive the contractor of his right to do the work according to his own initiative, so long as he does it in accordance with the contract. The control of the work reserved in the employer which effects a master-servant relationship is control of the means and manner of performance of the work as well as of the result; an independent contractor relationship exists where the person doing the work is subject to the will of the employer only as to the result, but not as to the means or manner of accomplishment. Accordingly, where an employer may prescribe what shall be done, but not how it shall be done or who shall do it, the person employed is an independent contractor, 27 Am. Jur. Independent Contractors, secs. 2, 3, 5, 7; 31 C. J. 473.”
 

 In the Miller case, claimant Miller relied on the cases of
 
 In re Rogavin,
 
 259 App. Div. 774 [18 N. Y. S. (2d) 302], and
 
 Ajello
 
 v.
 
 Savarins Management, Inc.,
 
 259 App. Div. 949 [19 N. Y. S. (2d) 886], Our appellant likewise relies upon them. The court in the Miller case distinguished them as follows: “In the Rogavin case [259 App. Div. 774, 18 N. Y. S. 2d 303], the contract was executed by one Azpiazu ‘individually and as agent for his orchestra’, one of whom was the claimant. Under the agreement each member of the orchestra was employed by the restaurant company and it reserved the right to direct and control in many respects the manner in which such members should perform their services. In fact, the contract provided that the restaurant should have ‘personal supervision and control of the artists at all times.’
 

 “In the Ajello case the employer secured the services of one Barrett, an orchestra leader, to assemble an orchestra to furnish dance music at its restaurant. Claimant became a member of the orchestra for that special engagement. Bar
 
 *Supp. 853
 
 rett was the employer’s agent and the contract in that case specifically provided that claimant and the other members should be deemed to be employees of the appellant.
 

 “In the case under consideration Worth executed the contract not as an agent but as a principal. In the instant ease all the elements upon which liability was predicated in the Rogavin and A j ello cases are lacking. The facts are entirely dissimilar.”
 

 One of the principal cases relied upon by counsel for appellant is that of
 
 Steel Pier Amusement Co.
 
 v.
 
 Unemployment Compensation Commission,
 
 (September 1941) 127 N. J. L. 154 [21 A. (2d) 767], Similar questions were involved in that case as in our case with respect to an orchestra leader and the members of his orchestra and the amusement company for which they played. The Supreme Court of New Jersey held that a member of the orchestra was an employee of the amusement company. However, that ease is clearly distinguishable from ours both under the facts and under the law. The contracts in question were very short, being quite dissimilar from our contracts, and declared that the orchestra leader was acting as the agent for the members of the orchestra. The court specifically declared that the relationship between the parties had to be determined from the statutory viewpoint alone. The opinion then quoted portions of the Unemployment Act of New Jersey, which have no comparable counterpart in our act. It is also of interest that the Supreme Courts of Nebraska and of Wyoming, in passing upon the same questions involving orchestras and in construing statutes identical with that of the State of New Jersey, came to a contrary opinion. These eases are
 
 Hill Hotel Co.
 
 v.
 
 Kinney,
 
 (1940 Neb.) 138 Neb. 760 [295 N. W. 397], and
 
 Unemployment Compensation Com.
 
 v.
 
 Mathews,
 
 (1941) 56 Wyo. 479 [111 P. (2d) 111].
 

 When we apply the statutory law of California and the rules laid down by the courts of this state and of New York, as set forth above, to the facts in our case, we are of the opinion that the relationship of the appellant and the various members of his orchestra was that of employer and employee. The terms of the contract between the appellant and the members of his orchestra clearly established the relationship of employer and employees. The appellant assembled the orchestra, furnished the music library, contracted for the engagements and set the terms thereof, received all
 
 *Supp. 854
 
 the proceeds from such engagements, out of which he was only obligated to pay each member an amount equal to the union scale of wages, and then after paying all expenses retained the balance, if any, for himself. He acted as leader, fixed the time and place for rehearsals and directed other similar matters. He could discharge any member unsatisfactory to him and select any new member, provided such member entered into the organization under the same terms and conditions as the rest. Operating under the contract the appellant secured the engagements through the Music Corporation of America, as his agent. The financial records (Exhs. D, E and F) disclose that the compensation to the members remained more or less constant whereas the appellant at times made a large profit and at others actually suffered a financial loss. It is apparent that the contract created an “employment” under the Unemployment Insurance Act. The obligations of the members were “services performed for wages under a contract for hire” (§6.5 of the act). The members were servants, i.e., employees, since they “rendered personal service to the appellant remaining entirely under his control and direction.” They were under the complete control of the appellant insofar as the details of or the means by which the work was to be accomplished, and received a fixed salary.
 
 (Western Indemnity Co.
 
 v.
 
 Pillsbury, supra; Brosius
 
 v.
 
 Orpheum Theater Co., Ltd., supra; Winther
 
 v.
 
 Industrial Accident Com., supra; Bohanon
 
 v.
 
 McClatchy Co., supra.)
 
 The appellant retained the unlimited right of discharge that could be exercised arbitrarily by him.
 
 (Winther
 
 v.
 
 Industrial Accident Com., supra.)
 
 The appellant was an “employing unit” under section 9 of the act since he “had in his employ one or more individuals performing services for him within the state. ’ ’
 

 Counsel for appellant has urged that the appellant and the members of his orchestra were partners or joint adventurers. With this we cannot agree. They were not “an association ... to carry on as co-owners a business for profit” (Civ. Code, §2400). They did not share in the profits, except for their wages, did not contribute to the losses, were subject to discharge by appellant at any time, had no voice in the selection of new members or the wages to be received by any of their fellow members above the union scale nor of the manner in which the appellant carried on his business.
 

 
 *Supp. 855
 
 We are also of the opinion that the relationship of the defendant to the establishments for which he and his orchestra played was that of an independent contractor. This relationship is rather clearly disclosed from the form of contract used (Exh. C) and the stipulation of facts. The contract, in addition to the stipulated facts, recites that it is between the attraction, Jimmie Grier and his orchestra, and the employer, naming it, fixes a lump sum as the price and is signed “Jimmie Grier by Music Corporation of America, authorized representative.” There are other recitals for the benefit of the agent and the union which do not concern us. The relationship as thus disclosed is undoubtedly that of independent contractor insofar as the appellant and the establishments are concerned, with the members of the orchestra not being employees of the establishments.
 

 The “things done” by the establishments, as set forth in the stipulation, were those which appear reasonable from the nature of their business, and were directed toward the “results” to be accomplished rather than the “means” used therefor.
 
 (Western Indemnity Co.
 
 v.
 
 Pillsbury, supra.)
 
 The “results” for the most part were the entertainment and satisfaction of the public, the orchestra being one of the attractions. For this purpose the establishments designated the place of performance, gave directions covering what they expected, prescribed the route to be followed in going to and from the orchestra stand, gave orders
 
 re
 
 the conduct of members during rest periods, required the orchestra to coordinate and conform to the convenience of the rest of the activities carried on by the establishments, required home town music to be played and at certain tempos, and required the wearing of particular uniforms. Such “rights” did not in themselves create the relationship of master and servant. (See cases cited below.)
 

 On the other hand the employment contract was for a fixed term with no right of discharge of either the appellant or the members of his orchestra.
 
 (Winther
 
 v.
 
 Industrial Accident Com., supra; In re Earle,
 
 (May, 1941) 262 App. Div. 789 [27 N. Y. S. (2d) 310].) The compensation to appellant was a fixed sum for the engagement with no attempt to interfere with appellant’s right to hire and discharge his orchestra’s members and to pay them such wages and at such times as he desired. Also the manner in which the musical selec
 
 *Supp. 856
 
 tions were to be arranged and presented was entirely under appellant’s control. It thus appears that while the establishments exercised a certain measure of control for a definite purpose, they did not have “authoritative” or “complete control.”
 
 (Western Indemnity Co.
 
 v.
 
 Pillsbury, supra; Bohanon
 
 v.
 
 James McClatchy Pub. Co., supra.)
 
 The reservation of powers was necessary to enable the establishments “to coordinate the entire performance” and “the requirement to abide by reasonable rules and regulations, ’ ’ in view of their business, would naturally be imposed upon independent contractor and employees alike.
 
 (Brosius
 
 v.
 
 Orpheum Theater Co., Ltd., supra.)
 
 See also
 
 In re Radio City etc. Corp.,
 
 (Nov. 1941) 262 App. Div. 593 [31 N. Y. S. (2d) 284],
 

 For the reasons set forth at the beginning of this opinion, the judgment is reversed, and the cause is remanded to the municipal court for a new trial.
 

 Bishop, Acting P. J., and Fox, J., concurred.