[Civil No. 4587. Filed September 27, 1943.]

[141 Pac. (2d) 395.]

DEAN A. SISK, ROBERT D. KENDALL and JOHN M. SAKRISON, as members of and constituting the EMPLOYMENT SECURITY COMMISSION OF ARIZONA, Appellants, v. ARIZONA ICE & COLD STORAGE COMPANY, a corporation, Appellee.

Mr. Arthur M. Davis, for Appellants.

Messrs. Conner & Jones, for Appellee.

ROSS, J.—The appellee is a corporation organized under the laws of Arizona with its principal place of business located in Tucson, Pima County. It is engaged in the business of manufacturing ice and selling it to the public. Two-thirds of its products it disposes of directly to the custom and the other one-third reaches the custom through persons selected and employed by it to deliver its products and collect the price therefor from the custom.

The Employment Security Act of Arizona, Article 10 (sections 56–1001 to 56–1022), Arizona Code 1939, as amended by Chapter 124, Session Laws of 1941, was enacted under the police powers of the state and provides ''for the compulsory setting aside of unemployment reserves to be used for the benefit of persons unemployed through no fault of their own.'' Section 56–1001, as amended by section 1, Chapter 124, *supra*. Under the act every employer of three or more persons (with exceptions not necessary to state) is required to pay contributions on such persons' wages into the reserve fund for use during periods of unemployment. The appellee paid to the commission contributions on the sales and deliveries of ice made directly to the custom by itself and its agents but refused to make like payments on the other sales and deliveries, contending that the retail drivers were not its employees and not under its control or direction.

The Employment Security Commission of Arizona, under section 56–1011, as amended by section 11(b) (2), Chapter 124, *supra,* upon its own motion, after notice and hearing, determined that the appellee corporation was an employer within the terms of the act, that the services were for it and in connection with its business and constituted it an employing unit, and that it should make contributions on all wages earned by the retail drivers from and after January 1, 1936.

From this determination the corporation appealed to the Superior Court of Pima County and after hearing upon the record the court decided that the retail drivers of the corporation ''are not employees'' within the meaning of the Employment Security Act and that no contributions are due or payable by it in connection with the operations of such retail drivers.

The commission has appealed from such decision, contending, of course, that the facts show the corporation to be an employing unit as defined by the act and liable for contributions on the wages of the retail drivers. This is the question that we are to decide.

Most of the states (38 or more) have acts similar to ours. Many of them have been construed but the constructions have not always been in agreement. They all recognize, however, the legislation to be in the interests and for the security of the ''worker and his family.'' It is an effort to stabilize employment and to secure to the workman and his family an opportunity to have and enjoy the common and ordinary comforts of life during periods of depression and unemployment. The legislature, to assist in the accomplishment of that very laudable object, has provided that certain employers should contribute a percentage on the wages paid by them into a fund, and the question is, is the appellee corporation under the law and the facts required to make such contribution.

We are to determine (1) whether the retail dealers in ice performed "services for wages" for appellee within the meaning of section 56–1002, as amended by section 2(i) (1), Chapter 124, *supra,* which provides that

." 'Employment' means any service . . . including service in interstate commerce, performed for wages or under any contract for hire, written or oral, express or implied";

and (2) whether if such retail dealers did perform "service for wages or under contracts of hire" nevertheless they are within the provisions of subdivision (i) (5) (A), (B) and (C) of said amended section 56–1002. Such subdivision reads as follows:

"(5) services performed by an individual for wages or under any contract of hire shall be deemed to be employment subject to this act unless and until it is shown to the satisfaction of the commission that:

"(A) such individual has been and will continue to be free from control or direction over the performance of such services, both under his contract of hire and in fact; and

"(B) such service is either outside the usual course of the business for which such service is performed or that such service is performed outside of all the places of business of the enterprise for which such service is performed; and

"(C) such individual is customarily engaged in an independently established trade, occupation, profession, or business of the same nature as that involved in the contract of service."

The framers of this legislation evidently were familiar with the laws in the field occupied by the laboring man and the problems pertaining thereto. While the definitions therein show that before the employer can be required to contribute to the reserve fund there must exist some privity of contract or employment relationship, it quite clearly appears that

the relationship need not be that of master and servant or employer and employee or principal and agent.

■■ In *Creameries of America* v. *Industrial Commission,* 98 Utah 571, 102 Pac. (2d) 300, 302, the court, in referring to the law of that state, which is the same as our (A), (B) and (C) above, said:

"From the above provisions it seems clear to us that the legislature has endeavored to define by the Act itself a classification of individuals entitled to unemployment benefits. Hence, the statutory definition, rather than any common law concepts, if differing therefrom, govern—insofar as they are applicable. The fact that neither the term 'employee' nor the term 'independent contractor' is used anywhere in the Unemployment Compensation Act is itself indicative that the legislature did not intend to use the relationships of 'independent contractor' or 'employer-employee,' as defined by the common law, as the criteria to determine who are entitled to benefits under the Unemployment Compensation Act. The word 'individual' is used throughout the Act to refer to the person seeking unemployment benefits. While the terms 'employer' and 'employing unit' are used, they are specifically defined by the Act so that they have a distinct meaning which may or may not coincide with the ordinary conception of 'employer.' Where words are defined in a particular statute, and it is clear that the legislature intended to give to such words a different meaning than the one generally and ordinarily given to such words, the statutory definition is the one to be applied. . . .

"We adhere to our previous decision to the effect that whether applicant Foss is entitled to unemployment benefits must be determined from the tests laid down in the Unemployment Compensation Act, rather than from any common law concepts of master and servant. The first question to be determined, as hereinbefore stated, is whether the applicant 'performed services for wages' for the plaintiff."

See, also, *Unemployment Compensation Comm.* v. *National Life Ins. Co.,* 219 N. C. 576, 14 S. E. (2d) 689;

*Rahoutis* v. *Unemployment Compensation Comm.*, Or., 136 Pac. (2d) 426.

It appears that the services must be for wages. The contribution to be paid is based on the wages and consists of a percentage thereof. It is possible to contend the retail dealers were not paid wages, that therefore there is no basis upon which to compute contributions. It is apparent that their compensation for delivering the ice to the custom was to consist of the difference between what the appellee charged them for it and what they received from the custom, and the question is whether the legislative intent was that such remuneration should be classified as wages in construing the terms of the act. *Creameries of America* v. *Industrial Commission, supra.* Section 56–1002, as amended by section 2(n), Chapter 124, *supra,* reads as follows:

"(n) 'Wages' means all remuneration for services from whatever source including commissions and bonuses and the cash value of all remuneration in any medium other than cash. Gratuities customarily received by an individual in the course of his work from persons other than his employing unit shall be treated as wages received from his employing unit. The reasonable cash value of remuneration in any medium other than cash, and the reasonable amount of gratuities, shall be estimated and determined in accordance with rules prescribed by the commission; . . . ."

This definition of wages is broad enough to cover the situation here. " 'Wages' means all remuneration for services from whatever source . . . . " After this omnibus clause, and to reach and cover devices invented to defeat its intent, the statute specifically defines commissions, bonuses, gratuities, etc., as "wages" when given as remuneration. From the whole context of the act, we have no doubt that the legis-

lature intended that the remuneration received by the retail dealers should be classified as "wages."

"An examination of the pertinent definitions in the Unemployment Compensation Act make it readily apparent that such words as 'employment,' 'employer,' 'employing unit,' 'wages,' and 'remuneration,' when used in the Act, are not used as words of art having rigid, precise and restricted meanings, but rather, as defined by the Act itself, are,used as broad terms of description, evidencing a legislative intent to give to the Act a broad and liberal coverage to the end that the far-reaching effects of unemployment may be alleviated." *Unemployment Compensation Commission* v. *Jefferson Standard Life Ins. Co.*, 215 N. C. 479, 2 S. E. (2d) 584, 587.

■ Since it appears that the remuneration of the retail dealers is wages, the question is whether the facts bring the case within the provisions of (A), (B) and (C), or whether such services "shall be deemed to be employment subject to this act." Subdivision (5), *supra*. Before the services may be treated as not within the act, the concomitants of (A), (B) and (C) must concur. Not only must the facts show the retail dealer was free from control or direction over the performance of his services, both under his contract of hire and in fact, but they must also show (B) that the services for which the retail dealer is compensated is a service not in his employment or that it was rendered outside of all places where the business of the ice company was performed, and (C) that the retail dealer is customarily engaged in an independently established business of the same nature. It is not sufficient to take a case out of the act to show the retail dealer is free from control or direction of the ice company in the performance of the services, but in addition thereto (B) and (C) must be shown to exist in fact. *Unemployment Compensation Comm.* v. *Jefferson Standard Life Ins. Co., supra.*

If the evidence shows that the services performed by the retail dealer were in the usual course of the ice company's business and at places where the ice company's enterprise was performed, and that such dealer was not ordinarily engaged therein as an independent business, then the facts show the dealer's wages to be within the act.

It is quite satisfactorily shown that the retail dealers of the ice company performed personal services for wages for the ice company and that therefore their employment was taxable as contended by the commission, unless the evidence shows the concurrent existence of (A), (B) and (C) as above set out.

The commission made findings of fact and these findings are well supported by the evidence and are as follows:

"The Arizona Ice and Cold Storage Company, an Arizona corporation, . . . is engaged in the business of manufacturing and selling ice, disposing of approximately two-thirds (⅔) of its products through wholesale sales which are handled by employees who are covered under the Employment Security Act and on whose service the company pays unemployment compensation taxes. The remaining one-third (⅓) of its sales are of a retail character and are handled through the individuals whose status is herewith in question.

"The company enters into separate written contracts with various individuals (hereinafter referred to as drivers) by the terms of which the company agrees to sell to the driver sufficient ice to supply retail ice customers in a certain precisely defined area in or adjacent to the city of Tucson. In determining such areas the company discusses the matter with the drivers, but the company is the final judge of what territory is included therein. The drivers agree to buy all of their ice from the company at a price to be fixed by the company from time to time; that the same shall be sold only in their own territory as specified by the company and that they shall not purchase

any ice from any other source for sale anywhere; each driver agrees to sell all ice possible and to maintain and operate at his own expense a delivery truck for the delivery of ice within his prescribed territory and that he will employ and pay all expense of any helpers who assist him; each driver agrees to purchase and maintain not less than Ten Thousand ($10,000) Dollars of public liability insurance to cover injuries done to persons or property by the truck; all of the drivers purchase their liability insurance in the same insurance company as the Arizona Ice and Cold Storage Company, and their purchases of such insurance are made through the same agent or broker. The agreement further provides that the drivers are not the agent or employees of the company; that the agreement does not create the relationship of master and servant, and that the company shall not be liable for injuries to persons or property caused by the truck of the driver. The agreement may be terminated by ten days' written notice by either party.

"Each driver is required to provide his own truck for ice deliveries, but if a new driver upon taking on a new route is unable to pay for the truck of his predecessor, the company advances the funds for that purpose and takes back a chattel mortgage which is repaid from the ice sales of the drivers.

"To advertise the company product, all of the trucks owned by the company itself as well as the trucks of the drivers are painted each year by the company in its color scheme of blue and white, with the name of the company on the side in large type. On the drivers' trucks, the name of the driver followed by the word 'owner,' is painted on the side of the truck below the driver's seat in type of letter smaller than the name of the company.

"In addition to the trucks of the drivers, the company maintains four of its own trucks which are driven by its own employees in the conduct of its wholesale operations and in the delivery of ice to its own cash and carry stations.

"The drivers obtain their ice in the morning and settle for it at the end of the day by paying for all ice sold by them and returning any unsold ice in good

condition. The company is the sole judge of what ice is returnable and what is not. The drivers assume the loss for unsold ice not returnable to the company. In paying for ice sold each day, drivers pay in cash and in coupons from books provided by the company and which are sold by the drivers to the various purchasers of ice. The drivers obtain their ice at the company plant, but if they call in the company will deliver ice to them in the summer in company trucks.

"Each driver pays the company at the end of the day for the ice sold by him, except that occasionally the drivers on heavy routes may be carried for several days at the beginning of the season when the drivers credits are heavy.

"When the drivers pay for their ice, they also pay the company an amount as sales tax, which amount is not computed by the company, but which is entered on the company books as 'Drivers' Sales Tax.' When the company transmits its sales tax on its wholesale operations, it also transmits as a separate item, the total sum received by it from all drivers, but does not allocate the total among the various drivers. This arrangement was established at the request of the Arizona Tax Commission.

"Each driver works his own territory as he sees fit, beginning work when he chooses and ending whenever he wishes. If a driver has difficulty with a customer on his route, the driver may request a driver from another route to serve her. Any credit extended by the driver is his own responsibility, unless the company expressly agrees to extend credit in that particular case. The company takes telephone calls for the drivers placing them on separate hooks maintained for each driver and when the drivers check in they collect their calls and fill the orders. Calls received by the company after a driver has quit for the day are phoned to his home and he may make the delivery or not, as he elects. If driver does not fill the order, the company has it delivered by a messenger paid for by the company and the driver receives no profit on the transaction.

"Each driver may or may not engage the services of an assistant as he sees fit. The company is not con-

sulted and exercises no voice in the selection. Each driver has his own Social Security Account Number and pays Old Age and Survivor's Insurance directly to the Collector of Internal Revenue on each assistant. The drivers leave their Social Security cards with the company, clipped to their contract, and if requested by the drivers, the company assists them in preparing their reports.

"The drivers are not required to attend conferences or sales meetings to stimulate sales of ice, but meetings are held from time to time to stimulate sales of ice boxes. Attendance is voluntary, but the meetings are generally in the form of dinners to induce the largest possible attendance. Representative of ice box companies provide the drivers with sales talks to be used by them in keeping their customers using ice. The company maintains an organization for the sale of ice boxes to consumers, as a means of stimulating the sale of ice. Drivers report the names of prospective purchasers of ice boxes to the company and are paid a bonus on each ice box sold by the company to persons so reported.

"The drivers are required to wear identical uniforms. The drivers pay for them and have a voice in selecting the design and material, but all must abide by the choice of the majority.

"Certain of the drivers have used their trucks for other business enterprises such as selling butter, eggs, etc., and hauling groceries and other goods while covering his regular ice selling route. Others have engaged in other work after completing their ice deliveries each day, such as selling orange juice, painting, or working as night jailer."

We think these facts reasonably establish that the retail dealers were not free from control and supervision under their contracts with the company nor in fact.

The judgment of the superior court is not supported by either the law or the evidence and it is therefore vacated and set aside and the case is remanded to that court with directions and instructions to enter

judgment in favor of the Employment Security Commission of Arizona in accordance with the findings of fact and conclusions of law made and entered by that body.

McALISTER, C. J., and STANFORD, J., concur.