539 P.2d 954

**ARIZONA DEPARTMENT OF ECONOMIC SECURITY, successor agency to the Employment Security Commission of Arizona, Appellant,**

v.

**Lawrence E. LITTLE, dba Broadmoore Barber Shop, Appellee.**

**No. 1 CA-CIV 2436.**

Court of Appeals of Arizona,
Division 1,
Department A.

Sept. 9, 1975.

Rehearing Denied Oct. 17, 1975.

Review Denied Dec. 2, 1975.

 

Bruce E. Babbitt, Atty. Gen., by James A. Tucker, Asst. Atty. Gen., Phoenix, for appellant.

Meyer & Bucichevich by Rad L. Bucichevich, J. Terence Fox, Stephen E. Silver, Phoenix, for appellee.

## OPINION

DONOFRIO, Judge.

This is an appeal from a judgment of the Superior Court reversing an order of appellant, Arizona Department of Economic Security, requiring appellee to pay unemployment contributions on amounts earned by certain barbers who practiced their trade at the Broadmoore Barber Shop in Tempe, Arizona. The basic issue is whether these barbers were employees of the barbershop within the meaning of the Employment Security Act of Arizona as defined in A.R.S. § 23–615.

Appellee, Lawrence E. Little, leased from the building owner that portion of the building in which the barbershop was located. Effective June 1, 1969, the barbers who were previously employed by Mr. Little in the shop signed lease agreements with him whereby the individual barbers were considered by Mr. Little to no longer be his employees. The question before the court is whether the relationship between appellee Little and the individual barbers who worked at the Broadmoore Barber Shop was changed by the lease agreements of June 1, 1969, from that of employer-employee to that of independent contractor.

In analyzing the facts necessary for a determination of this question it is necessary to compare the relationship of the parties before and after June 1, 1969.

Mr. Little started operating his own barbershop on March 1, 1968, and as required by law he obtained his barber license and his barbershop license. The shop license was issued to Mr. Little individually as owner and operator doing business as the Broadmoore Barber Shop. The shop license remained in his name alone after June 1, 1969. All the other barbers had individual barber licenses but none had a business license. There was no change in the shop name or barber identification after June 1, 1969. Mr. Little owner the shop equipment consisting of 5 barber chairs, lathering machines, sterilizer and one central cash register. These he owned before and after the June 1, 1969 date. After the leases of June 1, 1969 the individual barbers continued to use this equipment but supplied their own hand tools such as scissors, combs and shears (which they had previously supplied), as well as supplies such as paper towels, tonics and shampoos (which Mr. Little had previously supplied). All the parties have at all times been members of the Barber's Union, and its rules were applicable to them. The shop was open from 8:30 a. m. to 5:30 p. m., which was a union rule, and the barbers' 70%–30% commission split with Mr. Little prior to June 1, 1969 was a union wage scale.

Prior to June 1, 1969 Mr. Little had considered the barbers working in his shop as his employees and had paid the unemployment tax on their wages. After the leases were signed by the individual barbers on June 1, 1969, he ceased paying the tax.

Mr. Little testified that the leases signed by the other barbers on June 1, 1969 was for the purpose of avoiding paying unemployment contributions and other taxes on the barbers' wages because he had concluded that he could not afford to stay in business and continue to pay the various taxes because of the economic slump in the barbering business. The lease transferred to each barber his chair and station for an indefinite period of time. Either party to the lease could terminate it at any time upon written notice. The lease provided that the barbers would each pay Mr. Little $10.00 per day for a five-day week after June 1, 1969. Mr. Little did not tell the

barbers how to cut a customer's hair before or after June 1, 1969.

After the lease was signed the barbers were allowed to make appointments with customers, which they could not do previously; other trade was handled as it had been before. Both before and after June 1, 1969 the barbers could take their lunch hour at any time they did not have a customer in their chair. A portion of the payments by the barbers under the lease was used by Mr. Little to pay for the shop overhead, whereas previously he had paid it himself. All barbers used the same cash register before and after June 1, 1969. The 3 full-time barbers have no source of income other than that derived from working in the Broadmoore Barber Shop.

In reversing the ruling of the Employment Security Commission the trial court relied for authority on a Tennessee Supreme Court case and an administrative ruling by the Internal Revenue Service under the Federal Unemployment Tax Act. We hold that reliance on those two authorities was misplaced.

▮ The Federal Unemployment Tax Act, 26 U.S.C. § 3301 et seq., by its terms defined "employee" under the usual common law rules applicable in determining the employer-employee relationship. 26 U.S.C. § 3306. The State of Arizona is among the minority of states that have abrogated the common law rules as a basis for definitions in its Employment Security Act in favor of a more liberal definition of "employee." At least as early as 1944 in the case of *Gaskin v. Wayland*, 61 Ariz. 291, 148 P.2d 590 (1944), our Supreme Court held that terms in our Employment Security Act such as "employment", "employer", "wages", and "remuneration" are not words of art with rigid meanings, but rather are used as broad terms of description, evidencing a legislative intent to give to the Act a broad and liberal coverage to the end that the far-reaching effects of unemployment might be alleviated. Likewise,

it was held in the case of *McClain v. Church*, 72 Ariz. 354, 236 P.2d 44 (1951), that determinations by federal courts as to what constitutes employment within the meaning of federal statutes are not binding upon Arizona courts in determining what constitutes employment within the State Employment Security Act. See also *Sisk v. Arizona Ice & Cold Storage Co.*, 60 Ariz. 496, 141 P.2d 395 (1943). Therefore it was error for the trial court to rely on the administrative ruling of the Internal Revenue Service as to the definition of employee.

The Tennessee case relied on by the trial court was *Burson v. Moore*, 224 Tenn. 55, 450 S.W.2d 309 (1970). Not only is that case factually distinguishable from the instant one, but it also is distinguishable because of Tennessee's reliance on the common law concept of employee in its Unemployment Tax Act. The Tennessee Act is similar to the Arizona Act that was repealed in 1947. It contains a three-part test to determine what services shall be defined as "employment." T.C.A. § 50–1309.

In the case of *Texas Co. v. Bryant*, 178 Tenn. 1, 152 S.W.2d 627 (1941), the Tennessee Supreme Court stated that the common law rules of master and servant were not subordinated to the three-part test in the statute. Our reading of the *Burson v. Moore* case, *supra*, indicates that the decision was based at least partially on the first part of the three-part statutory test, but in any case it did not change the rule of law established by the state's Supreme Court in the earlier *Texas Co.* case.

Significant factual distinctions in the *Burson v. Moore* case, *supra*, not present in the instant case were that each barber owned his own barber chair and equipment; each barber worked such days and hours as he chose; and for at least a portion of the period in question the shop license was issued in the joint names of all the barbers. Therefore it was error for the trial court to rely on the Tennessee case as authority in resolving the instant dispute.

In holding that these barbers were employees of Mr. Little in the instant case, we base our decision on the policy and definitions in the Arizona Employment Security Act and the case law interpreting it. The only significant changes in the relationship between Mr. Little and the other barbers in the Broadmoore Barber Shop after the "leases" of June 1, 1969 were, to-wit: the method of payment of the barbers, their purchase ot their own towels, tonics and shampoos, and the sharing of the maintenance costs (which was included in their "rental" paid to Little).

The Arizona Supreme Court has always adopted a liberal approach to application of the Employment Security Act. In the case of *Southwest Lumber Mills v. Employment Security Commission*, 66 Ariz. 1, 182 P.2d 83 (1947), the court stated:

> "In coming to any answer it has been remembered that the statute is remedial; that it enunciates and is addressed to a public policy; that it is ameliatory of the evils resulting from lack of employment; that it is to be liberally construed to effectuate its purpose; that devices of every kind to defeat it are to be frowned upon and stricken down; and that by the several Arizona cases construing and giving it effect this court has adopted an interpretation of it strictly in accord with its intent and objects as announced by the legislature in the preamble to the Act. (citations omitted)." 66 Ariz. at 5, 182 P.2d at 85.

■ The declaration of policy in the Act itself is the achievement of social security by encouraging employers to provide more stable employment and by the systematic accumulation of funds during periods of employment to provide benefits for periods of unemployment. 8 A.R.S. § 23–601. This policy of liberally interpreting the Act in an effort to include as many types of employment relationships as possible was reiterated in the case of *Beaman v. Superior Products, Inc.*, 89 Ariz. 119, 358 P.2d 997 (1961). We would likewise apply this interpretation as a matter of policy to the relationship that existed between Mr. Little and the other barbers in the Broadmoore Barber Shop.

■ There were certain facts in the instant case that we also considered significant as tending to establish an employer-employee relationship. We deemed it significant that none of the barbers had any investment in the barber chairs or other fixtures in the shop; that Mr. Little as well as the other barbers could terminate the relationship for any reason at any time; that the individual barbers had little, if any, say as to what were the operating rules of the shop; that the business license for the shop remained in Mr. Little's name; and that from the standpoint of the general public there had been no change in the relationship after June 1, 1969. The above were all factors considered by the court, and no one factor was of overwhelming importance. In our opinion, this was the type of business relationship that the Act intended to protect from the burdens of involuntary unemployment, and that these barbers were not truly independent contractors operating as separate business entities apart from Mr. Little as owner of the Broadmoore Barber Shop. We hold that this relationship was sufficient to meet the definition of "employment" as contained in 8 A.R.S. § 23–615: "* * * any service of whatever nature performed by an employee for the person employing him * * *".

By our decision in this case we do not wish to force a business relationship upon certain parties · when that relationship is not of their choosing. Therefore, we do not pass upon other factual situations and do not mean to imply that all barbershop businesses composed of more than one barber are necessarily employer-employee relationships under the Arizona Unemployment Compensation Law. However, in the instant case we hold that after June 1, 1969 these barbers were employees of Mr. Lawrence E. Little, dba Broadmoore Barber

Shop, and he is liable for the unemployment tax on their wages as ordered by the Employment Security Commission of Arizona in its decision of January 23, 1970.

The decision of the trial court is reversed.

OGG, P. J., and FROEB, J., concur.