**EMPLOYMENT SECURITY COMMIS-SION OF WYOMING, Appellant (Defendant-Respondent),**

v.

**LARAMIE CABS, INC., Appellee (Plaintiff-Petitioner).**

No. 84–71.

Supreme Court of Wyoming.

May 31, 1985.

Carl J. Hildebrand, Sp. Asst. Atty. Gen., Employment Sec. Com'n of Wyoming, Casper, for appellant (defendant-respondent).

No appearance for appellee (plaintiff-petitioner).

Before THOMAS *, C.J., and ROSE, ROONEY **, BROWN and CARDINE, JJ.

ROSE, Justice.

The sole issue raised in this appeal is whether the taxicab drivers who lease cabs from appellee Laramie Cabs, Inc. in exchange for a percentage of the fares are employees under the terms of the Wyoming Employment Security Law, §§ 27–3–101 through 27–3–704, W.S.1977. Appellant Employment Security Commission of Wyoming classified these workers as employees and required appellee to contribute to the unemployment compensation fund on their behalf. The district court overturned the agency's action on the ground that Laramie Cabs lacked sufficient control over the drivers, either in fact or under the lease agreement, for the drivers to qualify as employees under the employment security law.

While we agree with the district court's determination that the drivers performed their services outside the control of Laramie Cabs, that finding alone does not determine the workers' employment status under the law. We will hold that Laramie Cabs failed to carry its burden of establishing that the taxicab drivers were not in its employment, as that term is defined in

* Became Chief Justice January 1, 1985.

** Chief Justice at time of oral argument.

1. Section 27–3–502(a), W.S.1977, provides in part:

§ 27–3–104(b), W.S.1977, of the employment security law. We will, therefore, reverse the decision of the district court and reinstate the final action of the Employment Security Commission of Wyoming, which requires appellee to contribute to the unemployment compensation fund according to the wages earned by the taxicab drivers.

## FACTS

In the summer of 1982, Robert Sullivan, president of Laramie Cabs, Inc., notified the Employment Security Commission of Wyoming (ESC or Commission) that he considered his taxicab drivers to be independent contractors and that he wished to discontinue payments on their earnings to the unemployment compensation fund. Sullivan prepared a lease agreement under which Laramie Cabs would lease its vehicles to licensed taxicab operators, who would enjoy "complete discretion" in performing the duties generally associated with the taxicab business.

The field auditor and the contributions audit section of ESC determined that the leasing arrangement did not suffice to alter the status of the drivers as employees under the employment security law. Laramie Cabs appealed that decision to the Commission and requested a hearing pursuant to § 27–3–502, W.S.1977.[1] Prior to the hearing, Laramie Cabs began operating under the lease agreements. Accordingly, by the time of the employer liability hearing on March 1, 1983, appellee was able to present evidence of the actual working conditions under the new lease agreements.

### The Lease Agreement

The Taxicab Lease Agreement provides for Laramie Cabs to lease its radio-equipped vehicles to licensed operators and to maintain the cabs and equipment in good

"Upon its own motion or application of an employing unit and after notice and opportunity for hearing, the commission may determine if an employing unit is an employer and if services performed for the employing unit qualify as employment."

working condition. Laramie Cabs further agrees to furnish all gas, oil, antifreeze, and tires, to maintain liability insurance, and to assume responsibility for all licenses, taxes and fees for each vehicle. Paragraph 2 obligates the company to notify the drivers by radio or telephone of potential passengers:

"2. *Services:* Lessor agrees to make available telephone call service, radio service, and to furnish repair and maintenance service in connection with the operation of said leased taxicab. Lessor agrees to notify the various lessees of its taxicabs of calls received from persons desiring transportation upon an impartial basis in rotation or by notifying lessee of that taxicab which is nearest the location of the call."

In exchange for these services, supplies and equipment, the lessees-drivers agree to pay Laramie Cabs 60 percent of the fares collected each day and to abide by the company's rate schedule. The drivers further agree to operate the leased cabs reasonably, courteously, and lawfully and to test the equipment each day:

"9. *Operate Carefully and Lawfully:* In order to protect lessor's good will and licenses, lessee agrees to conduct himself (or herself) and to operate said taxicab reasonably, prudently, gentlemanly and courteously in a careful manner and in conformity with all laws, ordinances and regulations of the United States, the State of Wyoming and the City of Laramie and any political subdivision thereof, it being expressly understood between the parties hereto that once the lessee takes possession of the taxicab, _he will exercise complete discretion in the operation of same and in the performance of those duties tenerally [sic] recognized to be part of performing taxicab services. Discretion in the operation of the said taxicab is vested in the lessee and the lessor shall do no more than make available to lessee telephone call service or radion [sic] service of prospective passengers; lessee further agrees to return said taxicab to lessor at the end of each 24 hour term in as good a condition and repair as it was when received by lessee, reasonable use and ordinary wear and tear excepted. Lessee further agrees to inspect his (or her) taxicab at the beginning of each term, that _he will test the brakes, both foot and emergency, lights, signal lights and all other equipment; if lessee notes any defects, _he shall immediately report said defects to lessor."

The lease agreement may be canceled by either party upon written notice:

"6. *Term:* The term of this lease is for a period of twenty-four hours, but this lease shall be automatically renewed for a period of 24 hours per day from day to day under the same terms and conditions as stated herein unless one of the parties to this lease gives notice to the other party in writing that this lease shall not be renewed."

Finally, the agreement purports to establish the drivers as independent contractors, ineligible for unemployment benefits:

"11. *Status of Lessee:* By this agreement the lessor and the lessee acknowledge and agree that there does not exist between them the relationship of employer-employee, principal-agent, or master-servant, either express or implied, but that the relationship of the parties hereto is strictly that of lessor-lessee, the lessee being an independent contractor free from interference or control on the part of the lessor in the operation of said taxicab, subject only to adherence to applicable statutes and ordinances of the state, county and city in which said lessee operates equipment leased from lessor.

"12. *Unemployment Insurance:* Inasmuch as the relationship between the parties hereto is that of lessor and lessee, lessor shall not make any remittances for unemployment insurance and lessee shall not make any application for benefits under the Unemployment Compensation Act of the State of Wyoming upon the termination of this lease."

*Actual Working Conditions*

Laramie Cabs, the only taxicab service based in Laramie, holds a city license to

provide intracity transportation and a permit from the Wyoming Public Service Commission to operate within the state. Sullivan, the company president, testified that he maintains a list of persons who have been licensed by the City of Laramie to drive taxicabs. When a cab becomes available for lease, the company enters into an agreement with one of these eligible drivers.

Laramie Cabs obtains almost all of its business from patrons who contact the company by telephone. The dispatcher notifies the nearest driver, who can refuse to take the fare if he chooses. When that occurs, another driver, Sullivan or his wife transports the customer. Sullivan testified that each driver sets the days and hours which he wishes to work. The drivers enjoy some personal use of the leased vehicles, but must return the cabs to a central location when they are not available to drive for an extended period of time. Each driver pays his own fines for traffic violations as well as the liability-insurance surcharges which result from such violations.

Laramie Cabs presented evidence to establish that other governmental agencies, including the United States Department of Labor and the Internal Revenue Service, have recognized taxicab drivers as independent contractors under the type of lease agreement at issue here. Sullivan testified that the Wyoming Workmen's Compensation Division reviewed the company's lease agreement and concluded that the cab drivers were not employees for purposes of the Worker's Compensation Act. Finally, appellee introduced a summary of the results of a national survey of taxicab company operators, prepared by the University of North Carolina, which indicates that in 1982 58 percent of taxicab drivers were independent contractors.

*Disposition by the Agency and the District Court*

Based on the foregoing evidence presented by appellee at the administrative hearing, ESC determined that the taxicab drivers were employees under the employment security law:

"We conclude that these drivers were subject to direction and control by Laramie Cabs, Inc. Such is indicated by the ability of either party to terminate the relationship at any time without incurring liability, the restrictions on fares and the requirements concerning operating procedures. Also, the usual course of business for Laramie Cabs, Inc., is to provide cab service. It is apparent that the service provided by cab drivers is within that course of business. By necessity, the 'places of business' for Laramie Cabs, Inc., are principally the taxicabs themselves; these services were obviously performed therein by its drivers. In addition, the drivers were not customarily engaged in an independently established trade, occupation, or business. If they wish to drive a taxi in Laramie, Wyoming, they can only work for Laramie Cabs, Inc. The drivers have made no capital investment, and they are not responsible for sales taxes, advertising, gasoline and oil expenses, liability insurance, maintenance or other overhead.

\* \* \* \* \* \*

"It is our decision that the taxicab drivers working for Laramie Cabs, Inc., are engaged in employment for Laramie Cabs, Inc., and the wages paid are subject to Employment Security contributions."

Laramie Cabs petitioned the district court to review this final agency action. After consideration of the record, the court overturned the Commission's decision on the ground that Laramie Cabs lacked sufficient control over the drivers, either under the contract or in fact, to classify them as employees within the meaning of the employment security law. The Commission has appealed the district court's decision to this court.

### STANDARD OF REVIEW

Established standards guide our review of an appeal which stems from an administrative action following a hearing. We review the action as though it came directly to this court from the agency and

are not bound to accept any of the conclusions reached in the district court. *Wyoming State Department of Education v. Barber*, Wyo., 649 P.2d 681, 689 (1982). We follow the same rules of review as did the district court. Id. We must uphold the agency's decision which is supported by substantial evidence contained in the entire record. *Gulf Oil Corporation v. Wyoming Oil and Gas Conservation Commission*, Wyo., 693 P.2d 227, 239 (1985); § 16–3–114(c)(ii)(E), W.S.1977. Substantial evidence means such evidence as a reasonable mind might accept as adequate to support a conclusion. *Gulf Oil Corporation v. Wyoming Oil and Gas Conservation Commission*, supra.

█ In undertaking this review, we note that the legislature has expressly designated the Employment Security Commission as the body responsible for determining whether a particular working relationship constitutes employment under the Act.[2] The agency's decision, however, is governed by the statutory definition of employment, § 27–3–104(b), W.S.1977, discussed infra. We must, therefore, review the record to determine whether substantial evidence supports the agency's findings with respect to each of the criteria specified in the statute. *Tharp v. Unemployment Compensation Commission*, 57 Wyo. 486, 121 P.2d 172 (1942); *Unemployment Compensation Commission of Wyoming v. Mathews*, 56 Wyo. 479, 111 P.2d 111 (1941).

## EMPLOYMENT SECURITY LAW

### Definition of Employment

█ The employment security law defines employment as services performed for wages and requires the employer to contribute to the unemployment compensation fund based on those wages, unless the services satisfy three specified conditions. Section 27–3–104(b), W.S.1977, provides:

"(b) Services performed by an individual for wages is [are] employment subject to this act unless the commission finds:

"(i) The individual is free from control or direction over the performance of services by contract and by fact;

"(ii) The service is outside the usual course of business for which the service is performed or it is performed outside all of the employing unit's places of business; and

"(iii) The individual is customarily engaged in an independent trade, occupation, profession or business." ·

Section 27–3–102(a)(xviii), W.S.1977, broadly defines wage to include remuneration from any source:

" 'Wage' means remuneration payable for services from any source including commissions, bonuses and cash."

We have said that the statutory definition of employment determines whether a worker may be eligible for unemployment benefits under the Act, *Scott v. Fagan*, Wyo., 684 P.2d 805, 810 (1984). A worker is covered by the Act unless the hiring party establishes that the worker's services satisfy all three specified conditions of nonemployment. *Unemployment Compensation Commission of Wyoming v. Mathews*, supra.

Our legislation parallels that enacted by many states to ease the hardships faced by workers who find themselves unemployed. *See Ben Realty Co. v. Employment Security Commission*, Wyo., 416 P.2d 220, 222 (1966). As we review the status of the taxicab drivers in the case at bar, we find pertinent that said by the Supreme Court of Oregon in *Kirkpatrick v. Peet*, 247 Or. 204, 428 P.2d 405, 409 (1967), in analyzing a statutory definition of employment which substantially tracks our § 27–3–104(b)(i) and (iii):

"Our previous cases make it clear that in using the word 'employment' in the Unemployment Insurance Act the legisla-

---

**2.** Section 27–3–104(b), W.S.1977 provides in part:

"Services performed by an individual for wages is [are] employment subject to this act *unless the commission finds* [the existence of specified conditions.] * * * *" (Emphasis added.)

ture did not intend to incorporate the common law test for determining the master-servant relationship. Rather, the test is to be found by looking at the purpose of the Act. That purpose is served only if the Act is construed broadly enough to include persons who, although independent contractors according to the common law test, are peculiarly subjected to the hazard of unemployment because of the nature of their occupation."

See also *Clayton v. State,* Alas., 598 P.2d 84 (1979); *Graham v. Miera,* 59 N.M. 379, 285 P.2d 493, 496 (1955).

In recognition of the special purpose of employment security laws, courts have held that the agencies created to administer such laws are not bound by the rulings of other agencies based on different legislative enactments. The Court of Appeals of Arizona, in *Arizona Department of Economic Security v. Little,* 24 Ariz.App. 480, 539 P.2d 954, 956 (1975), discussed its reasons for adhering to this position:

"* * * At least as early as 1944 in the case of *Gaskin v. Wayland,* 61 Ariz. 291, 148 P.2d 590 (1944), our Supreme Court held that terms in our Employment Security Act such as 'employment', 'employer', 'wages', and 'remuneration' are not words of art with rigid meanings, but rather are used as broad terms of description, evidencing a legislative intent to give to the Act a broad and liberal coverage to the end that the far-reaching effects of unemployment might be alleviated. Likewise, it was held in the case of *McClain v. Church,* 72 Ariz. 354, 236 P.2d 44 (1951), that determinations by federal courts as to what constitutes employment within the meaning of federal statutes are not binding upon Arizona courts in determining what constitutes employment within the State Employment Security Act. See also *Sisk v. Arizona Ice & Cold Storage Co.,* 60 Ariz. 496, 141 P.2d 395 (1943). Therefore it was error for the trial court to rely on the administrative ruling of the Internal Revenue Service as to the definition of employee."

See also *Read v. Warkentin,* 185 Kan. 286, 341 P.2d 980, 986 (1959).

▮▮▮▮ We find the reasoning in these cases sound and conclude that general rules concerning the master-servant relationship or the independent-contractor concept are not determinative of a worker's status under the employment security law. Under § 27–3–104(b), *all* services for remuneration constitute employment subject to the Act, *unless* the existence of all three express factors justifies withdrawing a particular group of workers from the Act's coverage. This definition reflects the purpose of the Act to afford temporary protection to a broad range of workers involuntarily unemployed. With these concepts in mind, we turn to a consideration of the record in this case and the statutory criteria for assessing the work relationship.

## Freedom from Control

"The individual is free from control or direction over the performance of services by contract and by fact * * *." Section 27–3–104(b)(i), W.S.1977.

In applying this portion of the test to factual situations, in the past, we have found the existence of an employment relationship where the employer retained the right to control the details of the work, *Tharp v. Unemployment Compensation Commission,* supra, 121 P.2d at 176, or actually directed the worker's daily job performance, *Scott v. Fagan,* supra, 684 P.2d at 810. Under the Taxicab Lease Agreement in the instant case, the drivers agree only to operate their leased vehicles courteously and lawfully and to inspect the cabs for defects at the end of each term. The lease leaves the details of the job—such as work days, length of shifts and routes—to the discretion of the drivers. In practice, the drivers set the days and hours they choose to work, use the cabs for nonbusiness purposes, and can refuse to take fares at any time. The drivers pay their own fines for traffic violations, thus minimizing Laramie Cabs' interest in the daily driving routine.

The ESC cited the following facts in support of its conclusion that Laramie Cabs retained control over the drivers pursuant to the lease agreement:

" * * * The amount charged as a fare is not more than the amount in a rate schedule approved by the City of Laramie upon application by Laramie Cabs, Inc. * * *

" * * * Under the contract, either party to the agreement may terminate the agreement at any time. Drivers are required by the contract to operate the assigned cab carefully and lawfully, to be courteous to passengers and to inspect the cab before each use for any defects and report them to the company."

Our review of the entire record, however, convinces us that this evidence of control and direction over the drivers' job performance is insubstantial in comparison to the freedom enjoyed by the drivers, in fact and under the contract, to perform the details of their work as they see fit. The lease agreement sets out only broad policies of conduct, leaving the details of performance to the drivers. The City of Laramie, rather than Laramie Cabs, limits the rates for transporting passengers. While the right of either party to terminate the agreement upon written notice provides Laramie Cabs with some degree of control over the drivers, *Scott v. Fagan,* supra, this right, standing alone, is insufficient to establish control "over the performance of services." Section 27–3–104(b)(i). *Davis Cabs, Inc. v. Leach,* 115 Ohio App. 165, 184 N.E.2d 444 (1962).

*Service Outside the Course or Places of Business*

"The service is outside the usual course of business for which the service is performed or it is performed outside all of the employing unit's places of business * * *." Section 27–3–104(b)(ii), W.S. 1977.

This second factor is framed in the alternative so that to remove the taxicab drivers from coverage under the Act, their services must be either outside the business of transporting passengers by taxicab or performed outside all of the company's places of business. See *Unemployment Compensation Commission of Wyoming v. Mathews,* supra, 111 P.2d at 118. Since it is undisputed that the drivers in this case work within the usual course of the taxicab business, we turn to a consideration of whether the vehicles leased to the drivers qualify as the taxicab company's place of business.

The Court of Appeals of Georgia, in *Redwine v. Wilkes,* 83 Ga.App. 645, 64 S.E.2d 101 (1951), found that taxicab drivers worked within the company's place of business where, inter alia, the drivers received notice of waiting customers through the company's dispatching system:

" * * * As to subsection (B) the evidence showed that the service was performed in the usual course of the business of the Everready Cab Co., which was also in the usual course of the business of the individual taxicab drivers, and was performed in part at least within the place of business of the enterprise for which it was performed, in that the Company received telephone calls for patrons and relayed them to drivers over its own system, with the operation of which the drivers were not concerned * * *." 64 S.E.2d at 103.

In *Clayton v. State,* supra, 598 P.2d at 86, the Alaska Supreme Court concluded that a state-owned parcel of land called NC–88 constituted a place of business of a timber-cutting company so long as the company held a lease to harvest timber from that land:

" * * * With regard to (B), Clayton [the proprietor of the timber-cutting company and alleged employer] focuses on the second part requiring that the service be performed outside of all the places of business of Clayton's enterprises. He claims that his only place of business was his mill in Nenana, and that the workers at the NC–88 leasehold premises were thus performing services 'outside of all [his] places of business.' This argument is simply unrealistic. Clayton's

business involves processing lumber; NC–88, for which he bid on and won a contract to harvest timber, must be considered a place of business in 1974."

The business of Laramie Cabs consists of providing transportation to customers as requested. The taxicabs are leased to qualified drivers solely for the purpose of supplying such service. Customers trigger the dispatch of the leased vehicles by calling Laramie Cabs and requesting transportation. The taxicabs bear the company name and insignia, thus advertising their availability for hire.

█ The essence of Laramie Cabs' business is conducted in cabs between the customer's origin and destination, not in the company office. Given the nature of the taxicab business, we conclude that the vehicles which provide the service must be considered a place of business of the taxicab company.

*Independent Business*

"The individual is customarily engaged in an independent trade, occupation, profession or business." Section 27–3–104(b)(iii), W.S.1977.

The ESC cited the following facts in support of its conclusion that the taxicab drivers were not customarily engaged in independent businesses:

" * * * The drivers do not operate taxicabs for any other company and work under the auspices of the permits obtained by Laramie Cabs, Inc. The phone listing is placed under the name of Laramie Cabs, Inc., and any advertising is paid for by Laramie Cabs, Inc. Laramie Cabs, Inc., pays for the fuel, insurance, license plates, and P.S.C. plates. Laramie Cabs, Inc. * * * provides whatever maintenance and repairs are needed by the taxicabs.

\* \* \* \* \* \*

"The drivers for Laramie Cabs, Inc., make no capital investment in the corporation. If Mr. Sullivan agrees to place a driver on his list, the driver must only obtain his operating license and sign his contract."

We considered the question of whether barbers were engaged in an independently established business in *Tharp v. Unemployment Compensation Commission,* supra, 121 P.2d at 177. There the barbers and the barber-shop owner had entered into license agreements under which each barber received use of a chair, lavatory and surrounding space in the shop. The shop owner agreed to furnish supplies and utilities. We said:

"The barbers in question were not in this case 'engaged in an independently established trade, occupation, profession or business'. Under the License agreement Tharp bought their supplies, furnished them light, heat, water and a place to work and equipment vital to the carrying on of their business, i.e., chairs and lavatories, they supplying only the less expensive tools of their profession. This disposes of the requirement subd. (5)(C), supra [now (b)(iii)]." 121 P.2d at 177.

In discussing Oregon's counterpart to § 27–3–104(b)(iii), the Supreme Court of that state said in *Kirkpatrick v. Peet,* supra, 428 P.2d at 409–410:

"It is to be noted that the statute requires the occupation to be both 'independently established' and 'customarily' engaged in. This requirement is not met if the continued existence of the enterprise depends upon its relationship with a particular employer. If there is such dependence, the person employed does not have the prospect of supporting himself in the pursuit of his occupation if the person employing him terminates the relationship. It was the purpose of the Unemployment Insurance Act to provide relief where there was this type of risk of unemployment."

The Supreme Court of Washington espoused the same rule of independence in *Schuffenhauer v. Department of Employment Security,* 86 Wash.2d 233, 543 P.2d 343, 347 (1975), holding that Washington's statutory equivalent of § 27–3–104(b)(iii) calls for an enterprise which exists sepa-

rate and apart from the relationship with the particular employer and which will survive termination of that relationship.

The Appellate Court of Indiana, in *Young v. Indiana Employment Security Board*, 134 Ind.App. 263, 187 N.E.2d 489, 492 (1963), concluded that cab drivers were not engaged in an independently established trade:

> "As to being engaged in an independently established trade or business, the drivers employed none of their own capital, owned none of the equipment, had no business or overhead expense, nor did they incur any financial risk. The appellants are the ones who were engaged in the taxi business, and the drivers devoted their time and effort to the important function necessary to the taxi business of driving and operating such cabs."

Similarly, the Court of Appeals of Georgia, in *Redwine v. Wilkes*, supra, held that cab drivers did not engage in an independent business since they were required to operate under the auspices of the holder of a common carrier permit:

> " * * * As to subsection (C) [Georgia's counterpart to our subsection (b)(iii) ] the evidence was undisputed that in order for any taxicab driver in the City of Athens to operate a cab in that city it was necessary not only that he have an individual license, but that this license be used under and in connection with a franchise or permit granted to some person, firm or corporation who had qualified as a common carrier for hire and who carried insurance and otherwise fulfilled the conditions of the franchise. None of the drivers in question had such a franchise, nor did they customarily engage in an independently established trade or occupation." 64 S.E.2d at 104.

■ The taxicab drivers in the instant case work in conformance with the city and state permits held by Laramie Cabs. The company furnishes gas, oil and other supplies, carries liability insurance, pays licensing fees and maintains the cabs and other equipment. Laramie Cabs furnished the capital to purchase the cabs and other equipment and bears the risks attendant upon such investment. In sum, the drivers depend on their relationship with Laramie Cabs to earn their livelihood as taxicab drivers. We conclude that the evidence amply supports the Commission's finding that the drivers are not engaged in independent trades, occupations, professions or businesses within the meaning of the employment security law.

■ Finally, we note that the drivers' agreement, under the leasing arrangement, to waive any claim to unemployment benefits does not control the issues in this case. Section 27-3-319(a), W.S.1977, provides that such agreements made by employees are void:

> "Except as provided by W.S. 27-3-305 [concerning unemployment benefits withheld to satisfy an employee's child-support obligations], any agreement to waive, release or commute benefit rights or any other rights under this act [§§ 27-3-101 through 27-3-704] is void * * *."

Substantial evidence exists in support of the Commission's conclusion that Laramie Cabs failed to satisfy, with respect to its taxicab drivers, all of the exceptions to employment as defined in the employment security law. Therefore, the Commission's finding of employment is reinstated and the decision of the district court is reversed.

THOMAS, Chief Justice, specially concurring.

I agree with all that is said in the majority opinion except that with respect to the proposition of the right of control over the performance of services I would go even further than the majority. Were I one of the drivers for Laramie Cabs, Inc., I would be quite certain that if I did not comply with the desires of the owner the lease would not be renewed for the next twenty-four-hour period. I believe that pragmatically the lease must be perceived as furnishing to the owner the equivalent right of control that is to be found in any employment at will. Furthermore, under the appropriate standard of review, while differ-

ent arbiters might reach different conclusions, the record contains substantial evidence which a reasonable mind might accept as adequate to support a conclusion that the owner had preserved an effective right of control.

ROONEY, Justice, dissenting, with whom CARDINE, Justice, joins.

Although I agree with much of that said in the majority opinion, I believe that the substantial evidence before the commission established the status of the taxicab drivers to be that of independent contractors rather than that of employees of appellee. The letter opinion of the district court judge, the Honorable Arthur T. Hanscum, properly analyzed this relationship, and I would affirm his holding.

### STANDARDS OF REVIEW

The majority opinion notes that we must review an agency action based upon the evidence before such agency (unless additional evidence was taken by the district court pursuant to Rule 12.08, W.R.A.P.), and that we should affirm such action if it was based upon substantial evidence. However, we do not apply the same standard as applied to appeals in other matters; i.e., since 1979, we do not consider only the evidence of the prevailing party in gauging the existence of substantial evidence.[1] In *Board of Trustees of School District No. 4, Big Horn County v. Colwell*, Wyo., 611 P.2d 427, 428–429 (1980), we pointed out that:

> "Prior to 1979, the 'substantial evidence' standard was definitely mandated in the Wyoming Administrative Procedure Act:
>
> " '(c) The court's review pursuant to the provisions of this section shall be limited to a determination that:
>
> *   *   *   *   *   *
>
> " '(iv) The findings of facts in issue in a contested case are supported by

substantial evidence * * *.' Former § 9–4–114(c), W.S.1977.

"This subsection was amended, effective May 25, 1979, to require agency action, findings and conclusions to be supported by substantial evidence, but also to provide for a review of the 'whole record.' Under this standard, we do not examine the record only to determine if there is substantial evidence to support the Board's decision, but we must also examine the conflicting evidence to determine if the Board could reasonably have made its findings and order upon all of the evidence before it. After reviewing the history and rationale in changing the 'substantial evidence' rule in the Wagner Act to the 'whole record' provision of the Federal Administrative Procedure Act (similar to present provisions of § 9–4–114(c) [now § 16–3–114(c)]), the consideration is stated in *Universal Camera Corp. v. National Labor Relations Board*, 340 U.S. 474, 488, 71 S.Ct. 456, 465, 95 L.Ed. 456 (1951), and quoted in *National Labor Relations Board v. Walton Manufacturing Company*, 369 U.S. 404, 405, 82 S.Ct. 853, 854, 7 L.Ed.2d 829 (1962):

> " ' * * * the "reviewing court is not barred from setting aside a Board decision when it cannot conscientiously find that the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to the Board's view," it may not "displace the Board's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo*."
> * * * ' " (Footnote omitted.)

We have also recognized another standard for review in this type of case:

---

1. We have often said that on appeal we assume the evidence in favor of the successful party to be true and leave out of consideration evidence in conflict therewith, giving the evidence of the successful party every reasonable inference to

be drawn from it; e.g., *Martin v. Wing*, Wyo., 667 P.2d 1159 (1983); *Distad v. Cubin*, Wyo., 633 P.2d 167 (1981); *Kinsley v. McGary*, Wyo., 390 P.2d 242 (1964).

"We must strongly emphasize, however, that each case of this character must be decided upon its own set of facts. It is impossible to lay down a general rule and the case at bar may not be regarded as a precedent or controlling force in all litigated matters of this character." *Unemployment Compensation Commission of Wyoming v. Mathews*, 56 Wyo. 479, 111 P.2d 111 (1941).

## TAXICAB DRIVERS

The status of taxicab drivers has been a particular problem with reference to unemployment compensation statutes. The district court recognized this fact and noted that there was "competent legal authority on both sides of the coin," citing several cases holding each way. It pointed out that the cases with factual and statutory similarities with this case and our statute found the status to be that of independent contractor. The trial court referred to Annot.: Taxicab driver as employee of owner of cab, or independent contractor, under social security and unemployment insurance statutes, 10 A.L.R.2d 369 (1950); to Treasury Regulation 90, promulgated under Title IX of the Social Security Act, Art. 205; and to the definitions of "servant," "master," and "independent contractor" in Restatement of Agency 2d, §§ 2 and 220 (1958), to establish that the determinative factor on the issue of whether a worker is an employee or independent contractor is the amount of control exercised over the worker in the means, manner of performance and result in connection with the work activity.

The district court referred to and quoted from *Woods v. Nicholas*, 163 F.2d 615 (10th Cir.1947); *Party Cab Co. v. United States of America*, 172 F.2d 87 (7th Cir. 1949), *cert. denied* 338 U.S. 818, 70 S.Ct.

62, 94 L.Ed. 496; and *Davis Cabs, Inc. v. Leach*, 115 Ohio App. 165, 184 N.E.2d 444 (1962), to illustrate holdings and reasoning of other courts that taxicab drivers are independent contractors and not employees under the circumstances of this case. It noted that *Davis Cabs, Inc. v. Leach* was a case "virtually on 'all fours' with the instant case" in that its lease agreement was almost identical to that in this case.

## THE STATUTE

The majority opinion directs its attention to the three items listed in § 27–3–104(b), W.S.1977 (June 1983 Pamphlet),[2] as those which mark services by an individual as those of an independent contractor. I need not here consider the first of these three items inasmuch as the majority opinion agrees with the district court that such first item was satisfied in this case. In reviewing the facts of this case, the majority opinion agrees that a review of the entire record reflects that appellee's "control and direction over the drivers' job performance is insubstantial in comparison to the freedom enjoyed by the drivers, in fact and under the contract."

However, the majority opinion finds the two other requirements of § 27–3–104(b) were not met in this case. I disagree. I believe that under the facts of this case, the commission could not reasonably have made findings that (1) the services performed by the drivers were not performed outside appellee's place of business, and (2) the drivers were not customarily engaged in an independent occupation.

### Outside of Places of Business

The legislature did not intend the language of § 27–3–104(b)(ii) to encompass all of appellee's taxicabs as being "places of business," as was concluded by the majori-

---

**2.** Section 27–3–104(b), W.S.1977 (June 1983 Pamphlet), reads:

"Services performed by an individual for wages is [are] employment subject to this act unless the commission finds:

"(i) The individual is free from control or direction over the performance of services by contract and by fact;

"(ii) The service is outside the usual course of business for which the service is performed or it is performed outside all of the employing unit's places of business; and

"(iii) The individual is customarily engaged in an independent trade, occupation, profession or business."

ty opinion. In construing a statute, words must be given their ordinary, usual and plain meaning, and accorded their most obvious import. *Stagner v. Wyoming State Tax Commission*, Wyo., 682 P.2d 326, appeal dismissed —— U.S. ——, 105 S.Ct. 237, 83 L.Ed.2d 177 (1984); *Ward v. Board of Com'rs. of Johnson County*, 36 Wyo. 460, 256 P. 1039 (1927); *Board of Commissioners of Weston County v. Blakely*, 20 Wyo. 259, 123 P. 72 (1912).

> " * * * If a statute employs a term which has not a technical law, but has a standard popular meaning, it presumably employs it in the latter, unless another sense is clearly intended. * * * " *McCann v. The United States of America*, 2 Wyo. 274, 298 (1880).

Additionally, portions of an act must be read in pari materia, and every word, clause and sentence of it must be given effect, all with the purpose of ascertaining and giving effect to the legislative intent. *Haddenham v. City of Laramie*, Wyo., 648 P.2d 551 (1982); *Ross v. Trustees of University*, 31 Wyo. 464, 228 P. 642 (1924).

"[P]laces of business" may have varied shades of meaning resulting from the context in which the phrase is employed. Normally there can be a distinction between places of business and places where business is conducted. Likewise, there can normally be a distinction between places of business and places of employment. Sometimes the three terms can refer to the same place. There can be more than one place of business, more than one place where business is conducted and more than one place of employment. A building contractor or a carpenter contractor may conduct his business on the premises of a person who is having a house built. The premises may be the primary place of employment for the painter and carpenters doing the work and they may be a place where the contractors are conducting business. But the premises are not the places of business for the contractors. Process cannot be served on the contractors by leaving it at the houses with their owners as the "places of business" for the contractors. Their places of business are their offices, warehouses, etc.,

from which their contracting operations are really conducted.

That contained in the last paragraph is recited only to illustrate the varied shades of meaning which may be attributed to the words "places of business" resulting from the context in which used. The meaning may be slightly different where used in the context of service of process, licensing, liquor laws, parole, possession of fire arms, corporate activities, commercial code, etc. My position with reference to use of the phrase in § 27-3-104(b)(ii) has to do only with its use for unemployment compensation tax purposes by appellee and only with reference to the facts of this case.

In defining the plain and ordinary meaning of the term "places of business" as used in a statute worded as § 27-3-104(b)(ii), the Washington court held in *Northwest Tool & Supply, Inc. v. Employment Security Department*, 15 Wash.App. 118, 547 P.2d 908, 910 (1976), that "the term 'places of business' * * * was intended to refer only to fixed locations from or within which the employer transacts business, such as an office or warehouse." The issue in that case was whether the statute entitled the employer to an exemption from payment of unemployment compensation taxes. The dispute centered on whether the services of the sales people were performed outside of all the places of business of the employer, where the fact situation was that trucks were used as display areas and as transportation for the automobile salesmen to reach potential customers and to deliver tools. Certainly if these display delivery trucks were not the employer's "places of business," the taxicabs involved in this case were not appellee's "places of business."

The language "or it is performed outside all of the employing unit's places of business" would have no pertinency at all as a condition for independent contract status if "places of business" were interpreted to be places where business is conducted, such as in taxicabs as decided by the majority opinion. There never could be an instance or

place in which the person whose status is in question was not conducting business for or with the employing unit. Such interpretation was not intended. The very language of the paragraph anticipates situations in which the places where business is conducted are outside of the employing unit's place of business. The statute must be interpreted so as to give it effect in some situations. Every word, clause and sentence of a statute must be considered so that no part is inoperative or superfluous. *Attletweedt v. State*, Wyo., 684 P.2d 812 (1984); *Haddenham v. City of Laramie*, supra. Part of appellee's business may have been conducted in the taxicabs, and the drivers' places of employment may have been in the taxicabs, but the taxicabs were not appellee's places of business. A number of similar situations can be noticed: A law firm's place of business is not the courtroom; a post office's place of business is not each of the houses in the block where a mailman delivers mail, etc. Yet, these are places where the employer must conduct business. The legislature did not intend to designate the taxicabs as appellee's places of business.

The requirement of § 27-3-104(b)(ii) is pertinent to a situation such as existed in *Tharp v. Unemployment Compensation Commission*, 57 Wyo. 486, 121 P.2d 172 (1942), wherein, as noted in the majority opinion, the lease agreement was for the barber chair, lavatory and surrounding space in the lessor's barber shop. Obviously the services to be performed were not to be done outside the employing unit's place of business—a situation entirely different from that in this case.

Also of pertinency is the fact agreed upon in the majority opinion that appellee does not have control or direction over the performance of the drivers' services by contract or by fact. Such control could exist even if the services were performed outside appellee's places of business, and, perhaps could not exist even if performed within appellee's places of business. But the failure to have such control under the circumstances of this case is an important factor in deciding that the services were performed outside appellee's places of business. Lack of control over the manner in which the drivers operated the taxicabs, when they were operated, or where they were operated would amount to an inability on the part of appellee to control his own places of business—if the taxicabs are his places of business. Such result seems inconsistent with the normal and usual principles, rights, duties and obligations which are incident to the relationship which one has over his places of business.

Additionally, when § 27-3-104 is read as a whole, taxicab driving is not included within the statutory itemized list of that considered to be "'employment.'" Where a statute enumerates the subjects or things on which it is to operate, or the persons affected, or forbids certain things, it is to be construed as excluding from its effect all those not expressly mentioned under the rule of "'Expressio unius est exclusio alterius.'" *Town of Pine Bluffs v. State Board of Equalization*, 79 Wyo. 262, 333 P.2d 700, 708 (1958). Subsection (b) of § 27-3-104 applied in the majority opinion in reaching its result and quoted in full supra is preceded by subsection (a), which reads:

"As used in this act [§§ 27-3-101 through 27-3-704], 'employment' means service:

"(i) Performed by an employee defined under 26 U.S.C. § 3306(i) including service in interstate commerce, except 26 U.S.C. § 3121(d)(2) does not apply;

"(ii) Subject to any federal tax against which credit may be taken for contribution payments into any state unemployment fund;

"(iii) Required to be employment under this act as a condition for full tax credit against the tax imposed by 26 U.S.C. §§ 3301 through 3311; and

"(iv) Otherwise specified under W.S. 27-3-104 through 27-3-108."

26 U.S.C. 1982 ed. § 3306(i) except 26 U.S.C. 1982 ed. § 3121(d)(2) used in § 27-3-104(a)(i) to define employment service causes the applicable federal law to be:

" * * * '[E]mployee' means—

"(1) any officer of a corporation; or

\* \* \* \* \* \*

"(3) any individual (other than an individual who is an employee under paragraph (1) or (2)) who performs services for remuneration for any person—

"(A) as an agent-driver or commission-driver engaged in distributing meat products, vegetable products, fruit products, bakery products, beverages (other than milk), or laundry or dry-cleaning services, for his principal;

\* \* \* \* \* \*

"(D) as a traveling or city salesman, other than as an agent-driver or commission-driver, engaged upon a full-time basis in the solicitation on behalf of, and the transmission to, his principal (except for sideline sales activities on behalf of some other person) of orders from wholesalers, retailers, contractors, or operators of hotels, restaurants, or other similar establishments for merchandise for resale or supplies for use in their business operations; "if the contract of service contemplates that substantially all of such services are to be performed personally by such individual; except that an individual shall not be included in the term 'employee' under the provisions of this paragraph if such individual has a substantial investment in facilities used in connection with the performance of such services (other than in facilities for transportation), or if the services are in the nature of a single transaction not part of a continuing relationship with the person for whom the services are performed." [3]

The district court analyzed the foregoing and concluded that taxicab drivers did not fit the definition contained therein. The district court went on to say in its opinion letter:

" * * * Furthermore, it is interesting to note that the Internal Revenue Service has recognized the drivers' independent

status *in the present case*, meaning the Petitioner [appellee] need not make contributions under the Federal Unemployment Tax Act (26 U.S.C. §§ 3301 through 3311), a condition referred to in Wyoming's act, W.S. 27–3–104(a)(iii) cited above. Since the I.R.S. has recognized the drivers' nonemployee status under their laws, it seems this gives further credence to Petitioner's [appellee's] position in this case." (Emphasis added.)

Construing § 27–3–104 as a whole, subsection (a) supports an interpretation of the language in paragraph (ii) of subsection (b) to not include the taxicabs as appellee's places of business.

### Independent Occupation

With reference to the third requirement of § 27–3–104(b) of the independent contractor status, the very factors which the majority opinion accepted to reflect a lack of control by appellee over the drivers establish the independent occupation of the drivers and the fact that they customarily engage in driving the taxicabs. The majority opinion recites:

" * * * Under the Taxicab Lease Agreement in the instant case, the drivers agree only to operate their leased vehicles courteously and lawfully and to inspect the cabs for defects at the end of each term. The lease leaves the details of the job—such as work days, length of shifts and routes—to the discretion of the drivers. In practice, the drivers set the days and hours they choose to work, use the cabs for nonbusiness purposes, and can refuse to take fares at any time. The drivers pay their own fines for traffic violations, thus minimizing Laramie Cabs' interest in the daily driving routine."

The district court points out that the lease agreement purports to create a lessor-lessee relationship where the lessee is an "independent contractor free from interference or control on the part of the lessor in the operation of said taxicab." The lessee

---

**3.** Paragraph (2) is omitted pursuant to direction in § 27–3–104(a)(i) and subparagraphs (B) and (C) of paragraph (3) are omitted pursuant to direction in 26 U.S.C. § 3306(i).

is liable for sales and all other taxes. The drivers are free to take or refuse calls, set their own hours and days they wish to work, charge a fee of any amount up to the fare schedule, and use the taxicab for their own personal use. The dispatching feature is also optional with the driver.

All of these factors bear on the existence of an independent occupation on the part of the drivers. Today many businesses and occupations do not purchase their automobiles, tractor-trailers, trucks, etc. They lease them, usually with the lessor paying for the insurance, licenses, etc. One can rent a vehicle from the size of a pickup to a large van with which to move freight or furniture or almost any commodity, without becoming an employee of the lessor. Many of the freight and moving companies lease all of their motor fleets. An employer-employee relationship does not result in those situations. Section 27–3–104(b)(ii) does not require the occupation of the individual to be his only occupation. The drivers may also be students attending the University, clerks in a mercantile establishment, housewives, etc. It is sufficient that the driving of taxicabs be *an* independent occupation, customarily engaged in by

them. The nature of the occupation is to be judged as to these factors from the standpoint of the individual.

Once again, the acknowledged fact that the drivers are free from control or direction over the performance of their services, by contract and by fact, establishes the independency of the drivers in carrying on the task or occupation of operating the taxicabs. *In this instance,* the finding of lack of control by appellee over the drivers is tantamount to a finding that they are customarily engaged in an independent trade, occupation or business.

## CONCLUSION

The commission could not reasonably have made its findings upon the evidence which was before it in the whole record. I would affirm the decision of the district court.